NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 210329-U

NO. 4-21-0329

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 3, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.C. and A.S., Minors | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 20JA113 |
| v. | ) | |
| Gamontierra J., | ) | Honorable |
| Respondent-Appellant). | ) | Sam A. Limentato, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, concluding (1) the trial court abused its discretion
                when it admitted hearsay testimony, but the error was harmless where the State
                proved the allegations of neglect by a preponderance of the evidence and (2) the
                trial court's adjudicatory order finding the minors neglected and dispositional
                order finding parental unfitness were not against the manifest weight of the
                evidence.

¶ 2     In April 2021, the trial court adjudicated A.C. (born August 17, 2013) and A.S.

(born October 19, 2020) neglected after finding respondent, Gamontierra J., subjected them to

(1) an environment injurious to their welfare as defined by section 2-3(1)(b) of the Juvenile

Court Act of 1987 (Juvenile Act) (705 ILCS 405/2-3(1)(b) (West 2020)) (counts I and II) and

(2) a substantial risk of physical abuse as defined by section 2-3(2)(ii) of the Juvenile Act (705

ILCS 405/2-3(2)(ii) (West 2020)) (count III).  Jamal C., putative father to A.C., and Roger S.,

putative father to A.S., are not parties to this appeal.  Following a May 2021 dispositional

hearing, the trial court (1) made the minors wards of the court, (2) found respondent unfit, and (3) placed custody and guardianship of the minors with the Illinois Department of Children and Family Services (DCFS).

¶ 3        Respondent appeals, arguing (1) the trial court erred in overruling respondent's objections at the adjudicatory hearing, thereby admitting evidence unfairly prejudicial to respondent, (2) the trial court's adjudicatory order finding the minors neglected was against the manifest weight of the evidence, and (3) the trial court's dispositional findings of fact were against the manifest weight of the evidence, such that the trial court's dispositional order removing custody of A.C. and A.S. from respondent was an abuse of discretion. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        On October 30, 2020, the State filed a petition alleging A.C. and A.S. were neglected pursuant to section 2-3(1)(b) of the Juvenile Act (705 ILCS 405/2-3(1)(b) (West 2020)), where the minors' environment was injurious to their welfare when they resided with respondent or Roger S. because the environment exposed them to abuse of a sibling, G.T., now deceased. The petition alleged that on October 29, 2020, DCFS took the minors into protective custody. The allegations of abuse and neglect stemmed from respondent giving birth to A.S. on October 19, 2020, and having an open DCFS and criminal investigation regarding the June 2019 death of her child, G.T. (born May 14, 2018). Following an October 30, 2020, shelter care hearing, the trial court granted DCFS temporary custody of A.C. and A.S.

¶ 6        In January 2021, the State filed a first amended petition alleging (1) A.C. was neglected pursuant to section 2-3(1)(b) of the Juvenile Act (705 ILCS 405/2-3(1)(b) (West 2020)), where the minor's environment was injurious to her welfare when she resided with respondent or Roger S. because the environment exposed her to abuse of her sibling, G.T., now

deceased; (2) A.C. and A.S. were neglected pursuant to section 2-3(1)(b) of the Juvenile Act (705 ILCS 405/2-3(1)(b) (West 2020)), where their environment was injurious to their welfare when they resided with respondent or Roger S. because the environment exposed them to the risk of abuse; and (3) A.C. and A.S. were abused pursuant to section 2-3(2)(ii) of the Juvenile Act (705 ILCS 405/2-3(2)(ii) (West 2020)), where respondent and Roger S. created a substantial risk of physical injury to the minors by other than accidental means, "which would likely cause death, disfigurement, impairment of the physical or emotional health and/or loss or impairment of any bodily functions of the minors."

¶ 7                                    A. Adjudicatory Hearing

¶ 8            Over six days in the spring of 2021, the trial court conducted an adjudicatory hearing. Below, we summarize the testimony presented during the hearings.

¶ 9                                         1. *Cara Jones*

¶ 10            Cara Jones testified she worked as an investigator at DCFS from March 1, 2018, to November 16, 2020. On May 23, 2019, Jones received a report that respondent took her 12-month-old child, G.T., to the Carle Foundation Hospital Emergency Room in Champaign, Illinois, for "unexplained bruising." Respondent also had another child, A.C. (age 5). On May 23, 2019, Jones met respondent at the emergency room. Jones testified that respondent told her she walked A.C. to the bus stop that morning, returned home, showered, and then fetched G.T. from her bed when she noticed bruising on G.T. Respondent texted her paramour, Roger S., to tell him about the bruising on G.T. and let him know she was taking G.T. to the emergency room. Respondent told Jones the bruising could have been from a fall G.T. suffered two days earlier, when she fell from an adult size bed to the carpeted floor. Respondent explained she was

in the shower when she heard a loud thump and crying. Roger S. was in the apartment when G.T. fell.

¶ 11 Jones also spoke with A.C., who told her she and G.T. shared a bedroom. A.C. did not know what happened to G.T.'s face but said G.T.'s face was not bruised the previous night. Jones also spoke with Roger S. when he arrived at the hospital. Jones testified that at first Roger S. told her he had been out of the house the previous night and had not checked on G.T. but then he stated he "may have. He didn't know for sure." Based on the information provided to Jones, DCFS implemented a safety plan requiring respondent to be supervised in her home by Roger S.'s mother and prohibiting Roger S. from living in the apartment.

¶ 12 The next day, May 24, 2019, Jones took respondent and G.T. to an appointment with Dr. Buetow. Jones testified that after Dr. Buetow examined G.T. and opined G.T.'s injuries were not the result of abuse but rather could have been from a fall, DCFS cancelled the safety plan (after about 24 hours), and Roger S. was allowed to return to the apartment. Jones testified she observed the bed from which G.T. reportedly fell, and the bed was "a little high."

¶ 13 After the May 2019 incident, respondent kept Jones up to date about G.T.'s doctor's appointments and reported G.T. was doing well. Respondent told Jones that she took G.T. to a doctor's appointment to explore if G.T. had low hemoglobin which could result in G.T. bruising easily.

¶ 14 On the morning of June 14, 2019, Jones received a report that G.T. was admitted to the hospital in critical condition. Jones went to the hospital and spoke with respondent. Respondent told Jones that around 7 p.m. the previous evening, she braided the hair of a friend's little girl. At some point in the night, respondent put the little girl to bed with A.C. Around 2 a.m., the little girl's mother picked her up. Respondent then received a phone call from a friend

who asked respondent for a ride from Danville, Illinois, to the bus terminal in Champaign. Around 4:50 a.m., respondent drove to Danville and picked up her friend and her two children. When respondent left her apartment, Roger S. remained in the apartment with the children. Around 6 a.m., respondent arrived at the bus terminal in Champaign. However, the bus terminal did not have enough seats for respondent's friend and her children, so respondent drove them back to her apartment.

¶ 15 Around 7 a.m., respondent arrived back at her apartment. Respondent went inside her apartment and checked on G.T., who was asleep. Respondent then went back downstairs where her friend and her children waited. Eventually, respondent went back upstairs to her apartment and gave G.T. a bottle. Respondent went back downstairs for a bit, then returned upstairs to find Roger S. with G.T. Respondent observed Roger S. put G.T. in bed with him where Roger S. sat with G.T. as she returned to sleep. Respondent then left the apartment and drove her friend and her children back to the bus terminal. While at the bus terminal, respondent received a phone call from Roger S. who indicated G.T. was unresponsive. Respondent told Roger S. she would meet them at the hospital and rushed to the hospital. On June 14, 2019, at the hospital, Heather Forrest took over as investigator on respondent's case.

¶ 16 2. *Heather Forrest*

¶ 17 Heather Forrest testified she previously worked as a child abuse investigator at DCFS, and that on June 14, 2019, she was assigned to respondent's case after an unresponsive G.T. arrived at the hospital. On June 17, 2019, G.T. died. Forrest testified that throughout the investigation into G.T.'s injuries and death, respondent denied knowing anything about G.T.'s injuries and repeatedly asked whether Forrest was sure G.T. had not died from the May 2019 fall and a medical condition.

¶ 18 Forrest testified respondent's case involved three investigations. Sequence A— G.T.'s May 2019 fall—happened before Forrest took over the case. Sequence B coincided with G.T.'s June 14 hospitalization. Respondent and Roger S. were indicated in sequence B. Sequence C—A.S.'s birth—happened after Forrest left the case.

¶ 19 Forrest testified she implemented a safety plan in response to the investigation into G.T.'s injuries and death that initially required A.C. to reside with grandparents. Later, the plan was amended to permit A.C. to live with respondent as long as respondent's sister was present. Although she was unable to testify as to the specific language in the safety plan, Forrest indicated the safety plan prohibited contact between respondent and Roger S., and Roger S. and A.C. Forrest testified that while the safety plan was in place, A.C. said she had not seen Roger S. in a long time. Forrest had no reason to believe respondent or A.C. had contact with Roger S.

¶ 20 Forrest visited respondent's apartment and did not report any safety issues within the home. Forrest visited the home weekly from June 2019 until April 2020, when the visits went to monthly. In January 2020, DCFS terminated the safety plan because Forrest no longer had concerns about A.C.'s physical well-being while with respondent. In June 2020, Forrest left the case. Only when respondent gave birth to A.S. in October 2020, did Forrest learn respondent had been in contact with Roger S.

¶ 21                                    3. *Kristi Neitzel*

¶ 22 Kristi Neitzel testified she previously worked as a child protection investigator at DCFS, and that in July 2020, when Forrest took another job, respondent's case was reassigned to her. Neitzel met monthly with respondent and A.C. while ongoing medical and criminal investigations continued. Respondent told Neitzel she occasionally spoke with Roger S. on the telephone or via text message. Neitzel testified, "[Respondent] was not violating the safety plan,

but we kept reminding her that she should not allow him around her child." Respondent told Neitzel that she had a one-night stand with Roger S. in February 2020, and that A.C. was not present.

¶ 23 On October 20, 2020, Neitzel met respondent at the hospital after respondent gave birth to A.S. Respondent named Roger S. as A.S.'s father and said that, since the investigation started on June 14, 2019, she and Roger S. corresponded occasionally by telephone or e-mail, and she saw him in February 2020 when she became pregnant with their child. Neitzel asked respondent about G.T.'s death, and respondent told Neitzel neither she nor Roger S. caused G.T.'s death. Rather, respondent believed G.T.'s injuries and death stemmed from the May 2019 fall. In response, on October 29, 2020, Neitzel took A.C. and A.S. into protective custody. Respondent was indicated for substantial risk of harm based on a demonstrated lack of capability of protecting her children.

¶ 24 After DCFS took protective custody of the children, DCFS allowed respondent to have third-party supervised contact with the children at her mother's house because A.S. was a newborn and respondent was breastfeeding. In December 2020, Neitzel left the case.

¶ 25 4. *Detective Amy Petrilli*

¶ 26 Amy Petrilli, a detective at the Champaign Police Department, testified that she was assigned to investigate the injuries and subsequent death of G.T. On June 14, 2019, at the hospital, Detective Petrilli interviewed respondent, who described an events timeline leading up to G.T. being unresponsive and hospitalized. Respondent gave Detective Petrilli the same events timeline she provided Jones. Detective Petrilli testified that respondent "believed the reason why her daughter was in the hospital was from a pre—a preexisting fall that she had off of the bed, and from all the appointments that she had had."

¶ 27        On October 25, 2019, Detective Petrilli interviewed respondent at the police station. Detective Petrilli and respondent looked at photographs of G.T.'s injuries, and respondent offered explanations for some of the injuries. Detective Petrilli testified that at the time of the adjudicatory hearing there was still a pending criminal investigation into G.T.'s injuries and death, in which respondent and Roger S. were the only suspects.

¶ 28        Detective Petrilli testified she interviewed Roger S. three times during her investigation. On June 14, 2019, Detective Petrilli interviewed Roger S. at the police station. The State asked Detective Petrilli if Roger S. provided an events timeline consistent with respondent. Respondent's counsel objected, arguing hearsay. The trial court sustained the objection as to the form of the question but stated, "I think the point is if—if the—if the question is about the comparison drawn in all the statements, that's something else." Further, the court ruled the testimony was admissible against Roger S. as a statement by party opponent, but inadmissible hearsay against respondent.

¶ 29        Detective Petrilli testified that Roger S. told her that on the night of June 13, 2019, he left the apartment around 9 p.m. to take dinner and laundry to his mother. Roger S. then ran errands and returned home around midnight. When he arrived home, the girls were asleep in their room and respondent was asleep in her room. Roger S. showered and watched television until around 2 a.m. when the mother of the little girl whose hair respondent braided arrived to pick up the little girl. Roger S. next reported respondent woke him to tell him she was leaving and she left around 4 a.m. to drive to pick up her friend. Roger S. told Detective Petrilli that when respondent left the apartment, the children remained at home with him. Around 6 a.m., respondent returned to the apartment, woke Roger S., and asked him to give her friends a ride to Chicago. Roger S. told respondent no because he had court in the morning.

¶ 30         Roger S. indicated he did not interact with G.T. that morning until respondent left the house for the final time. Roger S. said G.T. was kind of whining so he went and got her from the air mattress and brought her into his and respondent's bedroom with the bottle of milk respondent gave her. Roger S. laid G.T. on her stomach and took a short Snapchat video of her to send to respondent. Detective Petrilli reviewed the Snapchat video timestamped at 6:46 a.m. and stated the video showed G.T. laying on her stomach. Roger S. told Detective Petrilli that after he took the Snapchat video of G.T., he watched videos on his cell phone until he heard a "loud gasp" come from G.T. In response, Roger S. grabbed G.T. and rushed her to the bathroom. Roger S. splashed water on G.T.'s hands in an attempt to revive her. When that did not work, he rushed her downstairs to a neighbor and asked for help. The neighbor performed cardiopulmonary resuscitation (CPR) on G.T., and someone called 911. Roger S. never provided a plausible explanation to Detective Petrilli as to the cause of G.T.'s injuries.

¶ 31         Detective Petrilli testified she also asked Roger S. about violence in the home. Roger S. told Detective Petrilli that respondent "got mad, she would start to cry, and then it would turn into the stage of cussing." The State asked Detective Petrilli whether Roger S. described respondent's frustration. Respondent's counsel objected, and the trial court sustained the objection.

¶ 32         On June 20, 2019, Detective Petrilli interviewed Roger S. at the police station. Detective Petrilli testified that Roger S. told her that on June 13, 2019, when he went out around 9 p.m., he was with another woman. Roger S. also provided more information about his home life. Roger S. told Detective Petrilli he resided at respondent's apartment about four nights a week. He began a relationship with respondent in February 2019, and on the morning of June 13, 2019, respondent received a five-day eviction notice.

¶ 33        Detective Petrilli testified that Roger S. told her "he had questioned a bruise on [G.T.'s] shoulder.  Whenever he—whenever he was coming home one day, he'd say that he'd saw, like, a bright purple bruise on her shoulder."  When Detective Petrilli asked Roger S., whom he questioned about the bruise, Roger S. said he asked respondent.  Then the State asked Detective Petrilli, "Did he say when he questioned [respondent] about this bruise?"  Before Detective Petrilli could respond, respondent's counsel objected based on hearsay.  Specifically, counsel said the question was "getting into what he said about any conversations with [respondent], and we're back to hearsay."  The trial court sustained the objection.

¶ 34        The State then asked Detective Petrilli if Roger S. provided any kind of explanation or described an incident that would explain G.T.'s injuries.  Detective Petrilli began by responding that Roger S. "gave a demonstration with a baby doll of how [respondent] would—" then counsel for respondent objected based on hearsay.  After arguments by the parties, the trial court sustained the objection to the detective testifying to what Roger S. alleged respondent said.  When the State asked for clarification about offering statements Roger S. made to Detective Petrilli about what [Roger S.] observed respondent do, the court told counsel for the State that, "you're on safe ground if you're asking about what Roger S. reported about his own actions or the conduct.  If you want to get into observations, then we'll have to take that as it comes along based on the question."

¶ 35        The State returned to the demonstration observation issue by asking Detective Petrilli what issues Roger S. speculated about.  Detective Petrilli testified that "it was a demonstration.  He demonstrated with a doll."  Counsel for respondent objected.  Counsel for the State indicated, "I don't intend to ask a further—a further question after that specific answer."  The trial court overruled the objection.

¶ 36     Detective Petrilli further testified that Roger S. told her he had concerns about G.T.'s "detachment [*sic*] with her mom, how she would act whenever her mom was not there." Roger S. told Detective Petrilli that G.T. would cry a lot. Detective Petrilli also testified that Roger S. told her there had been domestic violence in the home between him and respondent. In November 2020, Detective Petrilli interviewed Roger S. for a third time where she gave him a chance to review Dr. Petrak's medical reports.

¶ 37     Detective Petrilli also testified to the procedural steps taken to gather evidence during the investigation. Detective Petrilli stated that on June 14, 2019, law enforcement performed "a cell phone dump" on Roger S.'s and respondent's cell phones. Detective Petrilli described a "cell phone dump" as "I just take the phone and give it to the person that does it. It just does an extraction from the phone, from that device. So it includes, like, call logs, text messages, photos, [and] videos that are saved to the device." Both respondent and Roger S. consented to the "cell phone dump." Law enforcement obtained search warrants for respondent's Facebook and Snapchat accounts and Roger S.'s Snapchat account.

¶ 38     The State asked Detective Petrilli, "Did you find anything of evidentiary value in the Facebook return for [respondent]?" Before Detective Petrilli could respond, respondent's counsel objected based on the form of the question, hearsay, and lack of authentication of the Facebook posts. The trial court overruled the objection and informed respondent's counsel she would have an opportunity to cross-examine the witness.

¶ 39     Detective Petrilli testified to a text message conversation between respondent and Janae Burkes (Petitioner's Exhibit 14) and a Facebook conversation between respondent and her sister (Petitioner's Exhibit 15). Detective Petrilli stated the exhibits fairly and accurately

depicted the return from the "cell phone dump" and Facebook extraction she received in the fall of 2019.

¶ 40          As to the Facebook messages, Detective Petrilli testified that respondent communicated with her sister about G.T. Detective Petrilli testified that respondent authored a message on May 19, 2019, that said, in part, "You really got to make her ass holla." Detective Petrilli testified G.T.'s nickname was referred to in the messages. Detective Petrilli testified the conversation caused her concern. Further, Detective Petrilli stated the Facebook messages in Petitioner's Exhibit 15 fairly and accurately depicted the Facebook return she received. Subsequently, the State moved to admit the exhibit. Over respondent's counsel's continued objection, the trial court admitted the exhibit into evidence.

¶ 41          As to Petitioner's Exhibit 14, Detective Petrilli received the information from the "cell phone dump" completed on respondent's cell phone by the police department's High Tech Crimes Unit a few months after G.T.'s death. Detective Petrilli testified the exhibit contained text messages from April 29, 2019, between respondent and her friend, Janae Burkes.

¶ 42          The trial court then allowed respondent's counsel to ask Detective Petrilli a few questions about the "cell phone dump." Detective Petrilli testified that someone at the High Tech Crimes Unit performs a "cell phone dump" by taking the phone, hooking it up to software, and then the Cellebrite software program pulls the information from the phone. Detective Petrilli testified that the exhibit only contained text messages relevant to G.T. Respondent's counsel finished questioning the detective and objected to the detective reading the messages and to the exhibit being admitted as evidence on the grounds that it was not a return from a social media company in the format which it was taken but an independent, selective compilation. The trial court overruled the objection and stated it would "give it whatever weight it deserves."

- 12 -

Detective Petrilli then read three text messages where respondent complained about G.T. to Janae Burkes. Over respondent's continued objection, the trial court admitted the exhibit into evidence.

¶ 43 On cross-examination, the guardian *ad litem* asked Detective Petrilli, "Did [Roger S.] tell you that he had observed physical interactions by [respondent] towards [G.T.] that caused him concern for [G.T.'s] safety?" Respondent's counsel objected based on hearsay. Over objection, Detective Petrilli testified that Roger S. said, "[Respondent] would slam [G.T.] on the floor in a hastily [*sic*] manner when she would get frustrated. And she would shake her on her hip, like this (demonstrating)." Respondent's counsel again objected to the testimony based on hearsay. The trial court overruled the objection, finding Roger S.'s observation of an incident admissible. Specifically, the court ruled the evidence's prejudicial effect on respondent did not outweigh its probative value. Detective Petrilli testified Roger S. told her G.T.'s butt made contact with the floor when respondent slammed her down. Roger S. would intervene by taking G.T. to another room. Detective Petrilli testified Roger S. did not tell her how many times respondent slammed G.T. to the ground or when respondent shook G.T. on her hip.

¶ 44 5. *Respondent*

¶ 45 Before respondent testified, the trial court took judicial notice of a statement respondent made at the October 30, 2020, shelter care hearing. Specifically, respondent stated that she "remained in contact with [Roger S.] and that [Roger S.] had actually, in fact, attended the birth—the birth of [A.S.]."

¶ 46 Respondent testified that after G.T. died, DCFS placed her on a safety plan where her sister had to live in her home with her and A.C. and she could not be alone with A.C. Respondent corresponded with her caseworkers who occasionally visited her home. Respondent

- 13 -

testified her caseworkers would ask her how A.C. was doing, if she had contact with Roger S., and they sometimes told her about medical records. In January 2020, Forrest closed the safety plan.

¶ 47        On February 6, 2020, respondent received a letter from DCFS with her name and identification number on it. The letter said, in relevant part, "After a thorough evaluation, DCFS has determined the report to be 'unfounded.' This means that no credible evidence of child abuse or neglect was found during this investigation[.]" Respondent testified she recognized the letter to be confirmation that her case was being closed. After respondent received the letter, she spoke with her attorney about the letter, and in April 2020, when Forrest made an unannounced visit, respondent told her she thought her case was closed. Forrest explained to respondent that only part of the case was closed. Respondent testified she did not know there were two separate parts to the investigation.

¶ 48        In February 2020, respondent had sex with Roger S. at a friend's house, and A.C. was not present. Respondent stated the encounter with Roger S. occurred after Forrest closed her safety plan and she received the letter from DCFS. Respondent reconnected with Roger S. because she believed the case was closed. Respondent testified she did not have concerns that G.T. died due to abusive head trauma because, as she told Forrest, "it [had] always been something with the fall because I saw the difference when I was in and out [of] the hospital *** asking for help, and I was sitting [at] home. *** And it didn't add up for me." Respondent also testified that she knew the coroner ruled G.T.'s death a homicide because Detective Petrilli went over the autopsy results with her, but she thought "it [was] all wrong, but my feeling was it was all from her fall. Even after the autopsy."

¶ 49        6. *Medical Testimony Related to G.T.'s Injuries and Death*

¶ 50                              a. Mary Kathleen Buetow, M.D.

¶ 51          Mary Kathleen Buetow, an expert in the field of child abuse and neglect, testified to her education, qualifications, and her work.  In May 2019, Dr. Buetow worked as a pediatrician at Carle Foundation Hospital.  On May 24, 2019, Dr. Buetow examined G.T.  Dr. Buetow observed G.T. had several injuries, including bruising and swelling of the middle forehead, blood staining of her right upper eye lid and below both lower eyelids, a bite-mark on the right forearm, bruising of the left ear, and a small linear scratch on her right buttocks area. Dr. Buetow saw G.T. on referral after G.T. went to the emergency room the day before with injuries and there was a question as to whether the injuries were accidental or abusive.

¶ 52          Respondent told Dr. Buetow that on May 21, 2019—two days before respondent took G.T. to the hospital—she had been in the shower when she heard G.T. cry.  Respondent jumped out of the shower and found her boyfriend holding G.T.  Her boyfriend told her that G.T. had rolled off the adult bed and landed on her forehead.  Respondent told Dr. Buetow that G.T. showed no signs of bruising or swelling until a few days later.

¶ 53          Dr. Buetow opined G.T.'s forehead swelling would have been visible on May 21 but the bruising below the eyes could have appeared later.  Dr. Buetow reviewed X-rays taken on May 23, 2019, which showed abnormality of the humerus, suggesting a possible fracture, which can result from substantial pulling or yanking of the arm.  Dr. Buetow requested a two-week follow up visit for a repeat bone scan.  Further, G.T. exhibited some degree of anemia, and G.T. had a previously scheduled appointment with Dr. Easton for a routine visit and follow up for the anemia.  Dr. Buetow found respondent's explanation for G.T.'s injuries plausible but she "made a diagnosis of neglect, because the child was left unattended on an adult bed."

¶ 54        On June 7, 2019, at G.T.'s two-week follow up visit, Dr. Buetow noted G.T. was a "pleasant little girl." Dr. Buetow testified to being concerned with an abrasive lesion on G.T.'s waist, which respondent described as a rug burn. G.T. received more X-rays which confirmed G.T. "had a humerus fracture." Dr. Buetow also noted a suspicious finding at the T-4 vertebra, but she could not confirm whether it was a true abnormality.

¶ 55        Dr. Buetow testified she requested a two-week follow up visit and "notif[ied] DCFS that there were concerns, that although I had originally felt that the story was plausible, I was becoming more and more concerned that this was an abusive situation." G.T. died before Dr. Buetow saw her again. Dr. Buetow testified that based on her experience and training, G.T.'s death was not the result of low hemoglobin levels because they would not have caused bruising. Further, Dr. Buetow testified that G.T. had recovered from her May 24 injuries by the June 7 appointment and thus she did not believe those injuries caused her death.

¶ 56                          b. Brent Reifsteck, M.D.

¶ 57        Brent Reifsteck, a pediatrician at Carle Foundation Hospital, who headed the Child Abuse Safety Team, testified as an expert in the field of child abuse and neglect. On May 23, 2019, Dr. Reifsteck met G.T. in the emergency room where she was being treated for bruising. Respondent informed Dr. Reifsteck that G.T. had a history of hitting her head on the crib rail. Based on his observations of G.T. and G.T.'s history, Dr. Reifsteck did not consider a history of G.T. bumping her head against the crib a plausible explanation for her injuries. Dr. Reifsteck recommended DCFS continue its investigation and G.T follow up with Dr. Buetow the next day. Dr. Reifsteck testified that on June 13, 2019, G.T. had an appointment with Dr. Musselman about her anemia where he noted no injuries to G.T.

¶ 58        The next morning, on June 14, 2019, G.T. arrived at the hospital unresponsive and not breathing. Dr. Reifsteck evaluated G.T. and observed "she had bruises everywhere," a stark difference from what was reported the day before. Through evaluation, Dr. Reifsteck discovered G.T. had multiple fractures. An ophthalmology examination showed G.T. had multiple severe retinal hemorrhages which Dr. Reifsteck opined occurred from "abusive head trauma." Dr. Reifsteck testified that on June 17, 2019, G.T. was declared brain-dead. Subsequently, they removed G.T. from life support, and she died. Based on his experience and training, Dr. Reifsteck opined that G.T. died from "[a]busive head trauma."

¶ 59                            c. Shiping Bao, M.D.

¶ 60        Shiping Bao, an expert in the field of forensic pathology, testified that on June 19, 2019, he performed an autopsy on G.T. After performing an autopsy, Dr. Bao determined G.T.'s cause of death was a "subdural hematoma due to blunt force trauma of [the] head." Dr. Bao testified some of G.T.'s injuries were consistent with someone holding a baby in an aggressive manner and he found scars consistent with previous, repeated injuries.

¶ 61                            d. Channing Petrak, M.D.

¶ 62        Channing Petrak, an expert in the field of child abuse and neglect, testified that at the request of Forrest, she reviewed G.T.'s medical records and in July 2020, prepared a report about whether there was abuse or neglect in G.T.'s case. In preparation for her report, Dr. Petrak reviewed G.T.'s medical records and autopsy report. In her report, Dr. Petrak listed G.T.'s injuries and opined that severe head trauma caused G.T.'s death. Dr. Petrak also testified G.T.'s medical records showed no history of an underlying medical condition that would have made G.T. susceptible to such a head injury. In Dr. Petrak's medical opinion, G.T.'s bruises and injuries resulting in her death were due to "child physical abuse and abusive head trauma."

¶ 63                                    7. *Trial Court's Finding*

¶ 64            At the close of evidence, the trial court entered an adjudicatory order, finding

A.C. and A.S. neglected.  Specifically, the court stated,

>              "As to [respondent], the court finds that the death of [G.T.]
>
> has been proven to the standard of preponderance of the evidence
>
> to have been caused by abuse.  This abuse occurred while [G.T.]
>
> was in the care and custody of either Roger [S.] or [respondent].
>
> The Court does not find [respondent's] denial of knowledge of the
>
> injurious abuse as a cause of [G.T.'s] death sufficiently credible.
>
> While the maltreatment of one child is not necessarily *prima facie*
>
> evidence that anticipatory neglect is proven, it is a factor that is
>
> admissible and can be considered regarding other children
>
> involved.  [Respondent's] continued contact with [Roger S.] was
>
> significant enough to result in the birth of another child, namely
>
> [A.S.].  Therefore, the Court also finds that the State has met their
>
> burden of proof, namely the preponderance of the evidence, as to
>
> [respondent] as to all three counts of the first amended petition."

¶ 65                                    B. Dispositional Hearing

¶ 66            Over two nonconsecutive days in May 2021, the trial court held a dispositional

hearing.  For the dispositional hearing, Lutheran Social Services of Illinois (LSSI) prepared a

dispositional report.  According to the report, respondent's goal of "Return Home within 12

months" remained unsatisfactory because respondent failed to acknowledge the reasons her

children entered care.  Respondent resided in an apartment in Champaign, but the caseworker

had not yet visited the home. Respondent had no criminal record and reported having enjoyed a "positive" childhood. Further, the report provided that respondent communicated well with the assessment team and appeared engaged and forthcoming with information. Respondent "presented as intelligent and adept at presenting herself in a socially desirable and positive manner." Respondent was attending individual therapy and parenting classes. Respondent expressed sound and sincere attitudes toward parenting.

¶ 67 The report indicated current available documentation reported that G.T. died as a result of "abusive head trauma and child abuse over time" and noted respondent denied those allegations. Respondent did not believe that she or Roger S. contributed to G.T.'s death and she believed G.T.'s death resulted from a fall. Respondent's continued contact with Roger S. "led to concerns about [respondent's] judgement [*sic*] and ability to ensure safe supervision for her children." The report further stated, "As of 02/03/2021, this investigation is closed with INDICATED findings for both [respondent and Roger S.]"

¶ 68 Respondent submitted several letters from individuals expressing support for her and a report from her counselor, Mildred Williams, LCSW. Williams recommended reuniting respondent and the children. Williams stated, "My clinical opinion is wardship should be terminated, and the children and the client should be reunified immediately. The stress of separation and attachment issues impacting the client, her family, and the children, are more detrimental than the purpose of the separation."

¶ 69 1. *Shakura Sisson*

¶ 70 Shakura Sisson, a friend of respondent, testified that on multiple occasions she observed respondent with A.C. and G.T. Sisson described seeing respondent exhibit patience with younger children and showing A.C. how to express her feelings. Sisson never had any

concerns about G.T.'s or A.C.'s safety while with respondent. On cross-examination, Sisson testified she was unaware that in August 2019, G.T.'s death was ruled a homicide.

¶ 71                              2. *Ashley Danner*

¶ 72         Ashley Danner, a child welfare specialist with LSSI, testified she previously worked as a family caseworker for the Center for Youth and Family Solutions and began working on this case in April 2021. Danner wrote the dispositional report, which was based largely on the integrated assessment, which in turn was based on a December interview of respondent that Danner did not attend.

¶ 73         Danner testified that since starting as a caseworker on the case, she visited with A.C. and A.S. once at respondent's mother's home. Danner reported no safety concerns about the home. Danner testified that when she spoke with A.C., A.C. talked about school and how excited she was for summer break. A.C. reported that she liked living with her grandmother. Danner recommended services for respondent that included a parenting assessment, a psychological evaluation, continued individual therapy, and participation in counseling "with her daughter." Danner testified she rated the goal of "return home within twelve months" as unsatisfactory because respondent had not acknowledged the reasons her children were placed in care. Specifically, Danner stated, "I would like to know from [respondent's] perspective if she understands why her children came into care."

¶ 74                              3. *Trial Court's Finding*

¶ 75         After taking into consideration the dispositional report, all evidence and stipulations adduced at the dispositional hearing and earlier hearings, the permanency goal set for the minors by DCFS, the nature of the service plan, the recommendations and arguments of the parties, and the relevant statutory factors specified in section 1-3(4.05) of the Juvenile Act (705

ILCS 405/1-3(4.05) (West 2020)), the trial court found it was in the best interests of the minors and the public that the minors be made wards of the court. The court found respondent unfit and unable to parent.

¶ 76 The court adopted and incorporated "herein its findings rendered orally and in writing at all prior hearings including the temporary custody and adjudicatory hearing." Further the court stated, "Considering the health, safety, and best interest of the minors, appropriate services aimed at preservation and family reunification have been unsuccessful in rectifying the conditions that have led to the finding of unfitness, inability, and unwillingness to care for, protect, train, or discipline the minors."

¶ 77 Subsequently, the trial court entered a written dispositional order where the court (1) made the minors wards of the court, (2) found respondent unfit, and (3) placed custody and guardianship of the minors with DCFS.

¶ 78 On June 7, 2021, respondent filed a timely notice of appeal from the dispositional order in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). Thus, this court has jurisdiction to review the adjudicatory order and the dispositional order under Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016). See *In re Austin W.*, 214 Ill. 2d 31, 43-44, 823 N.E.2d 572, 580 (2005), *abrogated on other grounds by In re M.M.*, 2016 IL 119932, ¶ 31, 72 N.E.3d 260 (noting "dispositional orders are generally considered 'final' for the purposes of appeal"); see also *In re D.R.*, 354 Ill. App. 3d 468, 473, 820 N.E.2d 1195, 1199 (2004) (finding this court had jurisdiction of adjudicatory order because it "is a step in the procedural progression leading to the dispositional order").

¶ 79 II. ANALYSIS

¶ 80 On appeal, respondent argues (1) the trial court erred in overruling several of respondent's objections at the adjudicatory hearing, thereby admitting evidence unfairly prejudicial to respondent, (2) the trial court's adjudicatory order finding the minors neglected was against the manifest weight of the evidence, and (3) the trial court's dispositional findings of fact were against the manifest weight of the evidence, such that the trial court's dispositional order removing custody of A.C. and A.S. from respondent was an abuse of discretion. For the following reasons, we affirm.

¶ 81                                     A. Adjudicatory Finding

¶ 82 The Juvenile Act provides a two-step process the trial court must follow in determining whether a minor child should be made a ward of the court. 705 ILCS 405/2-18(1), 2-22(1) (West 2020). Step one is the adjudicatory hearing where the trial court considers only whether the children are abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2020).

¶ 83 Respondent argues she was deprived of a fair adjudicatory hearing where the trial court improperly admitted electronic evidence obtained through a "cell phone dump" and Facebook extraction. Respondent also argues the trial court improperly admitted hearsay evidence through Detective Petrilli where Detective Petrilli testified to statements made by Roger S. during his police interviews. The State argues the trial court did not abuse its discretion in its evidentiary rulings and even if it did, any error was harmless.

¶ 84 Generally, to preserve an issue for appellate review, a party must object at trial and file a written posttrial motion. *Thornton v. Garcini*, 237 Ill. 2d 100, 106, 928 N.E.2d 804, 808 (2010) (citing *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129-30 (1988)). However, in a nonjury civil trial, "[n]either the filing of nor the failure to file a post judgment motion limits the scope of review." Ill. S. Ct. R. 366(b)(3)(ii) (eff. Feb. 1, 1994). Here,

respondent objected to the evidentiary rulings at trial but did not file a posthearing motion. Where an adjudicatory hearing is akin to a nonjury civil trial, respondent properly preserved her claims of error for review when she objected to the evidentiary errors at trial. Thus, we will examine respondent's claims that the trial court improperly admitted electronic evidence and hearsay evidence.

¶ 85        At an adjudicatory hearing, the rules of evidence apply. *In re Chance H.*, 2019 IL App (1st) 180053, ¶ 48, 139 N.E.3d 88 (citing 705 ILCS 405/2-18(1) (West 2016)). "The admission of evidence by the trial court will not be reversed absent an abuse of discretion." *Id.* (citing *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 22, 61 N.E.3d 216).

¶ 86                    1. *Admissibility of Electronic Evidence*

¶ 87        Respondent first argues the trial court improperly admitted her text messages and Facebook messages obtained through a "cell phone dump" and Facebook extraction. The State argues respondent forfeited her claim under Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) where respondent (1) only referred to Illinois Rule of Evidence 901 (eff. Sept. 17, 2019) and (2) failed to provide any analysis as to why or how the foundation of the evidence was inadequate other than to assert Detective Petrilli's testimony was inadequate to authenticate the evidence.

¶ 88        Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) provides, in relevant part, "the appellant's brief shall contain the following parts in the order named: *** Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. *** Points not argued are forfeited."

¶ 89        Here, respondent seems to suggest the State needed to provide someone other than Detective Petrilli to authenticate and certify the "cell phone dump" and Facebook extraction

evidence. However, we find respondent's citation to Illinois Rule of Evidence 901 (eff. Sept. 17, 2019), followed by a statement asserting the State failed to authenticate the electronic evidence through Detective Petrilli, woefully inadequate. Absent is any argument asserting what necessary information or process the State failed to offer or undertake in order to support the authentication and admission of the evidence. Further, in response to the States forfeiture claim, respondent failed to file a reply brief. " 'A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation].' " *People v. O'Neal*, 2021 IL App (4th) 170682, ¶ 54 (quoting *People v. Jacobs*, 405 Ill. App. 3d 210, 218, 939 N.E.2d 64, 72 (2010)). Thus, we find this argument forfeited and decline to address the matter.

¶ 90                                                   2. *Hearsay*

¶ 91         Respondent next argues the trial court improperly admitted hearsay evidence through Detective Petrilli where Detective Petrilli testified to statements made by Roger S. during his police interviews. The State argues Roger S.'s statements to Detective Petrilli did not constitute hearsay where the statements were offered against Roger S. as an admission of a party opponent. The State asserts Roger S.'s statements to Detective Petrilli were not being offered against respondent. Moreover, the State argues any error was harmless.

¶ 92         Generally, hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is generally inadmissible unless a recognized exception applies. *Chance H.*, 2019 IL App (1st) 180053, ¶ 49 (citing *In re J.B.*, 346 Ill. App. 3d 77, 81, 803 N.E.2d 997, 1001 (2004)). Illinois Rule of Evidence 801(d)(2)(A) (eff. Oct. 15, 2015) provides that a statement is not hearsay if the statement is

- 24 -

offered against a party and is "the party's own statement, in either an individual or a representative capacity."

¶ 93    Here, the petition named Roger S. as a party and he was served by publication. During the adjudicatory hearing, Detective Petrilli testified to statements Roger S. made to her during his police interviews. On multiple occasions during the hearing, respondent's counsel objected to Detective Petrilli testifying to Roger S.'s statements. The trial court ruled that Roger S.'s statements were admissible as statements of a party but cautioned the State against trying to "backdoor" evidence against respondent through Roger S.'s statements. The court stated that it would only consider Roger S.'s statements as to him and not as to respondent. The court also sustained objections to Detective Petrilli's testimony where she was asked to repeat what Roger S. indicated he said to respondent in questioning her about G.T.'s bruises or what Roger S. said when describing respondent's frustration.

¶ 94    When Detective Petrilli was asked whether Roger S. provided any kind of explanation that would explain any injury to G.T., Detective Petrilli said, "He gave a demonstration with a baby doll of how [respondent] would—." Due to an objection by counsel for respondent and extensive argument by counsel, Detective Petrilli never testified to what the demonstration entailed. Thus, as it relates to a demonstration with a baby doll, Detective Petrilli never testified to any statements made by Roger S.

¶ 95    As discussed above, in most instances the trial court ruled Roger S.'s statements were only admissible against him as statements by a party opponent, or the statements were never testified to due to objections by counsel for respondent. However, we do find one instance where Detective Petrilli testified as to what Roger S. told her and the testimony was seemingly used against respondent. Specifically, the trial court allowed Detective Petrilli to testify to a

statement by Roger S. describing how respondent "would slam [G.T.] on the floor in a hastily [*sic*] manner when she would get frustrated. And she would shake her on her hip." According to Detective Petrilli, Roger S. went on to state respondent caused G.T.'s bottom to come into contact with the floor. Detective Petrilli's testimony outlining Roger S.'s statements to her describing his observations of respondent were out-of-court statements offered to prove the truth of the matter asserted. Thus, as to respondent, the statements constituted inadmissible hearsay.

¶ 96      Although Detective Petrilli testified to statements Roger S. made to her regarding what Roger S. observed, that posture does not alter our analysis as it relates to respondent. We note, had Roger S. testified, his testimony describing what he saw would not constitute hearsay as he would not be offering an out-of-court statement. Moreover, he would be testifying to what he saw, not a statement. The problem arose when the statement, testified to by Detective Petrilli, was used against respondent. The record appears to demonstrate that the trial court considered the statement against respondent where the court indicated Roger S.'s observations potentially prejudiced respondent and then ruled the evidence's prejudicial effect on respondent did not outweigh its probative value. Thus, we conclude in this instance the trial court abused its discretion in allowing Detective Petrilli to testify to the statement made by Roger S. describing respondent's physical interaction with G.T.

¶ 97                          3. *Harmless Error*

¶ 98      The State argues that even if the trial court erred in admitting hearsay evidence, any error was harmless. Here, respondent properly preserved her claim of error, warranting harmless-error analysis. Under the harmless error standard, "[e]rrors in the admission of evidence may be deemed harmless where ample evidence supported the court's neglect finding." *In re J.C.*, 2012 IL App (4th) 110861, ¶ 29, 966 N.E.2d 453 (citing *In re J.Y.*, 2011 IL App (3d)

100727, ¶ 15, 962 N.E.2d 1). We find our inquiry into whether ample evidence supported the trial court's neglect finding is similar to respondent's claim that the court's adjudicatory order finding the minors neglected was against the manifest weight of the evidence. Thus, we address both issues together. As to the court's neglect finding, respondent argues the State failed to present any evidence as to her treatment of A.C. or A.S. Further, respondent asserts the State also failed to present evidence to suggest she played a role in causing G.T.'s death.

¶ 99          "The State must prove allegations of neglect by a preponderance of the evidence." *Id.* ¶ 30 (citing *In re Arthur H.*, 212 Ill. 2d 441, 463-64, 819 N.E.2d 734, 747 (2004)). Under the Juvenile Act, a neglected minor is any minor under 18 years of age whose environment is injurious to his or her welfare. 705 ILCS 405/2-3(1)(b) (West 2020). " '[T]he term "injurious environment" has been recognized *** as an amorphous concept that cannot be defined with particularity.' " *Id.* (quoting *Arthur H.*, 212 Ill. 2d at 463). However, courts have interpreted the term "injurious environment" to include " 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Id.* (quoting *Arthur H.*, 212 Ill. 2d at 463).

¶ 100          In a hearing under the Juvenile Act, "proof of abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible." 705 ILCS 405/2-18(3) (West 2020). "While sibling abuse may be *prima facie* evidence of neglect based on an injurious environment, this presumption is not permanent; the presumption weakens over time and can be rebutted by the introduction of other evidence." *In re J.S.*, 2020 IL App (1st) 191119, ¶ 72, 160 N.E.3d 475.

¶ 101          " 'Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual

- 27 -

who has been found to have neglected or abused another child.' " *Id.* ¶ 73 (quoting *Arthur H.*, 212 Ill. 2d at 468). "A trial court presented with evidence of prior neglect by a parent should not be forced to refrain from acting until another child is injured." *Id.* (citing *In re Kenneth D.*, 364 Ill. App. 3d 797, 801, 847 N.E.2d 544, 548-49 (2006)). Each case of neglect "must be reviewed according to its own facts." *Id.* (citing *Arthur H.*, 212 Ill. 2d at 468-69). An appellate court will not reverse a trial court's neglect finding unless it is against the manifest weight of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17, 981 N.E.2d 336. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 102    Here, the State alleged A.C. and A.S. were neglected because their environment was injurious to their welfare where it exposed the minors to the risk of abuse and respondent created a substantial risk of physical injury to the minors. At the adjudicatory hearing, the State presented the testimony of several witnesses to establish G.T. died because of child abuse or abusive head trauma while under the care of respondent and Roger S. Multiple caseworkers and medical personnel testified to the events that led up to G.T.'s death.

¶ 103    On May 23, 2019, G.T. was hospitalized for "unexplained bruising." Respondent provided two different explanations for G.T.'s injuries. Respondent told (1) Dr. Reifsteck that G.T. had a history of hitting her head on the crib and (2) Jones and Dr. Buetow the bruising could have been from a fall G.T. suffered two days earlier, when she fell out of an adult size bed onto the carpeted floor. Respondent explained she was in the shower when G.T. fell and when she exited the shower, she found Roger S. holding G.T.

¶ 104    On the morning of June 14, 2019, G.T. was admitted to the hospital in critical condition. At the hospital, Jones spoke with respondent who gave her a timeline of events leading up to G.T.'s hospitalization. On the morning of June 14, 2019, respondent left her

apartment to drive a friend to the bus terminal. Respondent left A.C. and G.T. at the apartment with Roger S. Once at the bus terminal, respondent received a phone call from Roger S. that G.T. was unresponsive.

¶ 105    Detective Petrilli was assigned to investigate the injuries and subsequent death of G.T. At the hospital, Detective Petrilli interviewed respondent who described a timeline of events leading up to G.T. being unresponsive and hospitalized. Detective Petrilli also interviewed Roger S. who corroborated respondent's timeline of events.

¶ 106    When brought to the hospital, Dr. Reifsteck evaluated G.T. and observed "she had bruises everywhere." Through evaluation, Dr. Reifsteck discovered G.T. had multiple fractures. An ophthalmology examination showed G.T. had multiple severe retinal hemorrhages which Dr. Reifsteck opined occurred from "abusive head trauma." G.T. died a few days later. Dr. Bao performed an autopsy on G.T. and determined G.T.'s cause of death was a "subdural hematoma due to blunt force trauma of [the] head." Dr. Petrak reviewed G.T.'s medical records and autopsy report and opined that severe head trauma caused G.T.'s death. Dr. Petrak also testified G.T.'s medical records showed no history of an underlying medical condition that would have made G.T. susceptible to such a head injury. In Dr. Petrak's medical opinion, she found G.T.'s bruises and injures resulting in her death were due to "child physical abuse and abusive head trauma."

¶ 107    The State also presented testimony of two caseworkers who described the events following G.T.'s death. In response to G.T.'s injuries and death, Forrest implemented a safety plan that initially required A.C. to reside with her grandparents but was later amended to permit A.C. to live with respondent, as long as respondent's sister was present. Although Forrest could not recall the specific language in the safety plan, the plan did prohibit contact between Roger S.

and both respondent and A.C.  In January 2020, DCFS terminated the safety plan when Forrest no longer had concerns about A.C.'s physical well-being while with respondent.  Forrest testified that throughout the investigation into G.T.'s injuries and death, respondent denied knowing anything about G.T.'s injuries and repeatedly asked whether Forrest was sure G.T. had not died as a result of the May 2019 fall and a medical condition.

¶ 108    Neitzel testified that on October 20, 2020, she met respondent at the hospital after she gave birth to A.S.  Respondent named Roger S. as A.S.'s father and said that, since the investigation started on June 14, 2019, she and Roger S. corresponded occasionally by telephone or e-mail, and she saw him in February 2020, when she became pregnant with their child.  When Neitzel asked respondent about G.T.'s death, respondent told Neitzel that neither she nor Roger S. caused G.T.'s death.  Rather, respondent believed G.T.'s injuries and death were the result of the May 2019 fall.  Respondent testified that she knew the coroner ruled G.T.'s death a homicide because Detective Petrilli went over the autopsy results with her, but she thought "it [was] all wrong, but my feeling was it was all from her fall.  Even after the autopsy."  Both Dr. Buetow and Dr. Reifsteck testified G.T. had recovered from her May 23, 2019, injuries prior to her death.

¶ 109    Even without the consideration of the improper hearsay testimony of Detective Petrilli as to what Roger S. told her, the evidence, as reviewed above, demonstrates that the State provided ample evidence supporting the court's neglect finding.  Thus, any error in admitting the hearsay statements of Roger S. was harmless.

¶ 110    Also, when we consider the ample evidence supporting the court's neglect finding in conjunction with the evidence offered by respondent, we find the trial court's finding of neglect was not against the manifest weight of the evidence.  We note, while the State need not prove who caused G.T.'s injuries and subsequent death, the evidence showed G.T.'s injuries

occurred while in the care of either respondent or Roger S. Thus, even if respondent did not cause injury to G.T., her continued association with Roger S., with knowledge he was the last person with G.T. before she became unresponsive, put A.C. and A.S. at risk of abuse and physical injury. Moreover, respondent's failure to recognize G.T.'s injuries were not the result of a fall but rather the result of child abuse or abusive head trauma also put A.C. and A.S. at risk of abuse and physical injury. Ultimately, the trial court found the State proved A.C. and A.S. were neglected by a preponderance of the evidence. The court found G.T.'s death resulted from abuse and that the abuse occurred while in either respondent's or Roger S.'s care. While the court stated that "maltreatment of one child is not necessarily *prima facie* evidence that anticipatory neglect is proven, it is a factor that is admissible and can be considered regarding other children involved." The court determined respondent's continued (1) contact with Roger S. and (2) denial of knowledge of G.T.'s abuse created an injurious environment for A.C. and A.S. and created a substantial risk of physical injury to the minors. Accordingly, the trial court's finding of neglect was not against the manifest weight of the evidence.

¶ 111                      B. Dispositional Findings

¶ 112          Respondent next argues the trial court's dispositional findings of fact were against the manifest weight of the evidence, such that the trial court's dispositional order removing custody of A.C. and A.S. from respondent was an abuse of discretion.

¶ 113          Following an adjudication of neglect, the trial court must conduct a dispositional hearing to determine if the minor should be made a ward of the court. 705 ILCS 405/2-22(1) (West 2020). In considering the appropriateness of wardship, the court must decide if the parent is unfit, unable, or unwilling, for reasons other than financial reasons alone, to care for, protect, train, or discipline the child, and that the health, safety, and best interest of the child will be

- 31 -

jeopardized if the child remains in the parent's custody. 705 ILCS 405/2-27(1) (West 2020). We will not overturn the court's dispositional order unless it is against the manifest weight of the evidence. *In re Jennifer W.*, 2014 IL App (1st) 140984, ¶ 44, 22 N.E.3d 329.

¶ 114          Prior to the dispositional hearing, LSSI filed a dispositional report. According to the report, respondent maintained an apartment in Champaign, communicated well with the assessment team, appeared engaged and forthcoming with information, and attended individual therapy and parenting classes. However, the report indicated respondent's goal of "Return Home within 12 months" remained unsatisfactory because respondent failed to acknowledge the reasons her children entered care. The report provided G.T. died as a result of "abusive head trauma and child abuse over time." Respondent continued to deny that she or Roger S. contributed to G.T.'s death. Rather, respondent believed G.T.'s death was the result of a fall. Respondent's continued contact with Roger S. caused concern about respondent's judgment and ability to supervise her children.

¶ 115          Danner testified she began working on respondent's case in April 2021 and she wrote the dispositional report. Since starting as a caseworker on the case, Danner visited with A.C. and A.S. one time at respondent's mother's house. Danner reported no safety concerns at the home. Danner spoke with A.C., who talked about school and her excitement for summer break. A.C. reported she enjoyed living with her grandmother. Danner recommended services for respondent, including a parenting assessment, a psychological evaluation, and continued individual therapy and group therapy "with her daughter." Danner testified she rated the goal of "return home within twelve months" as unsatisfactory because respondent had not acknowledged the reasons her children were taken into care.

¶ 116    Respondent submitted information from Williams, who recommended reuniting respondent and the children. Williams noted the stress of separation and potential attachment issues were more detrimental to respondent and the children than the purpose of separation.

¶ 117    Sission testified on respondent's behalf. Sission testified she and respondent were friends and she had observed respondent with A.C. and G.T. on multiple occasions. Sission stated respondent taught her a lot about parenting and she never had any concerns about G.T.'s or A.C.'s safety while with respondent. On cross-examination, Sission testified she was unaware G.T.'s death was ruled a homicide in August of 2019. After reviewing the record, we find the trial court's dispositional finding of parental unfitness was not against the manifest weight of the evidence.

¶ 118    Ultimately, the trial court found it was in the best interests of the minors and the public that the minors be made wards of the court and adjudicated neglected. The court found respondent unfit and unable to parent. In reaching its decision, the court took into consideration the dispositional report, all evidence and stipulations adduced at the hearing and earlier hearings, the permanency goal set for the minors by DCFS, the nature of the service plan, the recommendations and arguments of the parties, and the relevant statutory best interest factors. The court also adopted and incorporated "findings rendered orally and in writing at all prior hearings including the temporary custody and adjudicatory hearing."

¶ 119    We find the trial court's decision was supported by the evidence. While respondent maintained stable housing, appeared engaged and forthcoming with information, and attended individual therapy and parenting classes, she failed to acknowledge the reasons her children entered care. Respondent's continued denial that she or Roger S. contributed to G.T.'s death and her belief that G.T.'s death was the result of a fall called into question respondent's

judgment and ability to care for A.C. and A.S. Further, the minors resided in a stable environment where A.C. reported she enjoyed living with her grandmother.

¶ 120　　　　Accordingly, we conclude the trial court's dispositional order was not against the manifest weight of the evidence.

¶ 121　　　　　　　　　　　　III. CONCLUSION

¶ 122　　　　For the foregoing reasons, we affirm the trial court's judgment.

¶ 123　　　　Affirmed.