2019 IL App (1st) 180053

FIFTH DIVISION
Filing Date: June 21, 2019

No. 1-18-0053

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| IN THE MATTER OF CHANCE H., TAMBI W., | ) | Appeal from the |
| CHADD H., CHENEY H., NIASIA W., CHARLES R., | ) | Circuit Court of |
| and RAEKWON W., | ) | Cook County. |
| | ) | |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | No. 17 JA 632 |
| | ) | 17 JA 633 |
| Petitioner-Appellee, | ) | 17 JA 634 |
| | ) | 17 JA 635 |
| v. | ) | 17 JA 636 |
| | ) | 17 JA 637 |
| WANDA W., | ) | 17 JA 638 |
| | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Maxwell Griffin, Jr., |
| | ) | Judge, Presiding. |

_____

JUSTICE HALL delivered the judgment of the court, with opinion.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment and opinion.

**OPINION**

¶ 1    On November 14, 2017, following an adjudicatory hearing in the circuit court of Cook County, the court adjudicated Chance H., Tambi W., Chadd H., Cheney H., Niasia W., Charles R. and Raekwon W., as neglected children due to an injurious environment as codified in section

2-3(1)(b) of the Juvenile Court Act (Act) (705 ILCS 405/2-3(1)(b) (West 2016). The court further determined that it was in the best interests of the children that they be made wards of the court, and guardianship of the children was placed with the Department of Children and Family Services (DCFS). 705 ILCS 405/2-27 (West 2016). Respondent, Wanda W., the mother of the seven children who are the subjects of this appeal, appeals the adjudication determination orders from the adjudicatory hearing.[1] We affirm.

¶ 2                           BACKGROUND

¶ 3     On June 29, 2017, the State filed a petition for adjudication of wardship in the circuit court of Cook County of the seven children: Charles R., born October 7, 2001; Raekwon W., born February 12, 2003; Niasia W., born March 5, 2004; Cheney H., born May 24, 2005; Chadd H., born July 8, 2007; Chance H., born January 10, 2009; and Tambi W., born December 18, 2013. The petition alleged that the children were neglected based on an injurious environment pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2016)) and abused based on a substantial risk of physical injury pursuant to section 2-3(2)(ii) of the Act (705 ILCS 405/2-3(2)(ii) (West 2016)), stating that respondent had four prior indicated reports for substance misuse, inadequate supervision and substantial risk of physical injury/environment injurious to health/welfare by neglect. On or about November 15, 2016, an intact case was opened, which was the second time intact services[2] had been offered to this family. Respondent was non-compliant with services including completing a substance abuse and mental health assessment.

_____

[1] Although respondent's notice of appeal indicated that she was appealing both the adjudication and disposition orders, respondent has not raised any argument regarding the disposition orders for our consideration on this appeal. Thus any concerns regarding the disposition orders are waived. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

[2] "Intact services" refers to in-home services designed to prevent children from entering the foster care system.

Two of the children reported that respondent was using illegal substances. Respondent had been diagnosed with depression and bipolar disorder. Respondent also threatened to harm some of the children.

¶ 4    A temporary custody hearing was held on June 29, 2017, with respondent present. To support the petition, the State presented testimony from the caseworker, Elysyka Beals, and investigator, Shimika Douglas. The court also heard testimony from 14-year-old Raekwon, who stated that he did not feel safe with respondent. He also testified that Niasia was 13 years old.

¶ 5    The trial court found probable cause that five of the children (Cheney, Chance, Chadd, Charles and Tambi) were abused and neglected, but did not find urgent necessity to remove them from respondent's care. The court found urgent necessity to remove Raekwon, who was placed in the custody of Dexter Leggins, a school staff member, with whom he had been living for a short time prior to the filing of the petitions, and Niasia, whose whereabouts were unknown. The other five children were allowed to remain in respondent's custody under a protective order pursuant to section 2-25 of the Act. 705 ILCS 405/2-25 (West 2016). The order required respondent to engage in substance abuse services and counseling, a mental health assessment and random drug screening.

¶ 6    At a July 6, 2017, status hearing, it was revealed that JCAP[3] recommended respondent complete inpatient residential drug treatment, but respondent declined referrals to all levels of treatment.

¶ 7    A subsequent temporary custody hearing was held on July 14, 2017, regarding Niasia and Raekwon. Niasia wanted to return to respondent so that she could ensure that her siblings were

---

[3] "JCAP" refers to Alcohol and Other Drug Abuse assessment services at the Juvenile Court Building.

safe. Raekwon's whereabouts were unknown. Beals testified regarding a substance abuse and mental health assessment respondent engaged in after the first temporary custody hearing. Douglas testified to her unsuccessful attempts to see the children in respondent's home and that she asked respondent to bring the children to court, but respondent refused and made threats to Douglas. Douglas made a referral for respondent to have a mental health assessment in June 2017, and eventually it was agreed that the assessment would be done in respondent's home. Respondent was eventually assessed in her home, but the report was based entirely on respondent's self-report.

¶ 8 Respondent testified that she had transportation issues and that the children who were not home when Douglas visited were at the pool and were old enough to be there without her. The court ordered that the order of protection be kept in place and that DCFS would see the children before July 21, 2017.

¶ 9 On July 25, 2017, a child protection warrant was issued for Raekwon and Leggins' guardianship was vacated. At an August 17, 2017, status hearing it was reported that respondent missed her appointment for substance abuse treatment.

¶ 10 On August 18, 2017, the public guardian filed an emergency motion to vacate the order of protection entered on June 29, 2017. The motion alleged that on August 16, 2017, Ada S. McKinley social worker Elyse Grayson-Lewis reported that she went to respondent's home to do an integrated social assessment. Raekwon and Cheney, were in the home and Grayson-Lewis could smell marijuana. An argument ensued between respondent and Raekwon, and the fight escalated to the threat of physical violence at which point respondent grabbed a large stick. Grayson-Lewis was unable to diffuse the situation and called the police. After Raekwon left,

respondent told Grayson-Lewis that she was going to boil some water and throw it on him in self-defense. A hotline call was made, and an investigation into the matter was pending.

¶ 11     Grayson-Lewis testified that when the case originally came into court for temporary custody, it was a sequence "R.[4]" Since that time, there were "S" and "T" sequences, in addition to the most recent incident, which was classified as a "U" sequence. The "T" sequence was opened when the police were called to the home and Charles was transported to the emergency room and later recommended for a partial hospitalization program. Grayson-Lewis testified that, in front of police officers, respondent threatened to kill Charles if she had to take him back into her home. That matter was still pending investigation.

¶ 12     Grayson-Lewis further testified that under the order of protection, respondent was required to participate in a substance abuse assessment and follow all reasonable recommendations. Respondent was assessed on July 5, 2017, by JCAP, but she declined the inpatient services and the offered Treatment Alternatives for Safe Communities (TASC) coach.

¶ 13     After an evidentiary hearing which occurred during multiple court dates of August 21 and August 22, 2017, and September 15, 2017, the trial court denied the public guardian's emergency motion but did set an adjudicatory hearing for October 25, 2017.

¶ 14     The adjudicatory hearing began on October 25, 2017.

¶ 15     Beals testified that she was the intact worker for the family from November 2016 until June 2017. She testified that on December 1, 2016, respondent informed her that she wanted Raekwon out of her home because of his disrespect. Beals in turn provided respondent with numerous referrals to seek treatment for Raekwon. On January 5, 2017, when she visited

---

[4] DCFS keeps track of investigations into abuse or neglect with letters of the alphabet.

respondent at the shelter where she was staying, respondent told her she had contacted an agency for mental health services for the children, and they told her the waitlist was two months long, which Beals told her was normal.

¶ 16    Beals further testified that she visited respondent several times in February 2017 and provided her with bus cards to get to her service appointments and a 90-day service plan. On February 21, 2017, respondent told Beals she did not make appointments for Raekwon and Cheney, so they called together and made an April 2017 appointment. In March 2017, the family was housed on the west side of Chicago, and Beals visited them every week or two. Respondent did not go to the April appointment for Raekwon because he was not home, but respondent did not indicate why she did not take Cheney.

¶ 17    Beals made a new referral for substance abuse treatment for Raekwon, and spoke with him on April 26, 2017, at Melody Elementary School where he and Niasia attended.  Raekwon told Beals that his brother Charles hit him in the face, and respondent had done nothing. Respondent also threw away his clothes over spring break. When asked about the altercation between Raekwon and Charles, respondent told Beals that she had done what she could to protect the other children in the home and that she hit Charles with a stick and "maced" him. Respondent also admitted that she had not made appointments for mental health assessments for Raekwon and Cheney, and a second appointment was made. On May 17, 2017, Beals received a call from respondent about an altercation with Raekwon because he was trying to get clothes from the house. Respondent told Beals that she told Raekwon she would hurt him if he came back to the house.

¶ 18    On May 30, 2017, Beals again spoke with Raekwon at school, and he told her he was living with Leggins because respondent was not letting him in the house. Raekwon also told Beals that respondent was using PCP again and continuously leaving the children home alone. Beals also spoke with Niasia at that time, who also stated that respondent was using PCP and that she threatened to harm her if she told DCFS anything. Niasia stated that respondent would lock herself in her bedroom for an hour or two, and when she came out, it smelled like drugs. Beals further testified that Niasia indicated that respondent left home on May 28, 2017, at 10 or 11 p.m., and did not return until the following day at 3 p.m. There were no other adults in the home and respondent told Niasia that she would kill the children herself so that she did not go to jail for choking Raekwon.

¶ 19    Beals requested that respondent do a urine screen for drugs on May 31, 2017, but respondent refused, even after being told that it would be counted as a positive drug screen. Beals contacted Shimika Douglas, an investigator who could look into the new allegations that were marked a sequence "R." Beals asked respondent to comply with a drug drop on May 31, 2017, but respondent failed to comply. Respondent had also been asked to complete substance abuse treatment and comply with a mental health assessment but failed to complete either task. Beals stated that she was concerned about the safety of the minors and took protective custody of them on May 31, 2017.  The protective custody lapsed while Beals was on vacation, and a safety plan was then put into place by the agency.

¶ 20    When Beals visited respondent at home on June 14, 2017, respondent told her that she had been diagnosed as bipolar, and she was trying to get documentation from the place where she had her mental health assessment done.

¶ 21 Dexter Leggins testified that he knew Raekwon from Melody Elementary School, where he was employed. In April 2017, Raekwon began living with him because respondent would not let him back in the house. At the beginning of June 2017, Niasia told him that she was afraid to go home because respondent said something about cutting her throat. Leggins testified that Niasia was crying and was very nervous, and he was concerned that she did not have a safe place to be. Leggins called respondent about Raekwon living with him to which she responded, "I don't give a f***." Leggins further testified that they tried to do some parenting classes together, but respondent never attended; nor did she ever ask that Raekwon return home.

¶ 22 Investigator Douglas (now Thompson)[5] testified respondent had four prior indicated reports and she had been assigned the "Q" and "R" sequences to investigate. She stated that she was assigned to investigate the "Q" sequence in April 2017, which was determined to be unfounded. Respondent had four prior indicated reports for inadequate supervision, substance misuse and substantial risk of harm. The "Q" sequence came in because of cuts, welts, and bruises for respondent and Raekwon. Regarding the "R" sequence, Douglas spoke with Beals on May 31, 2017, because there were concerns about respondent using PCP. Because of that conversation, she went to Melody Elementary School on May 31, 2017, and spoke first with the principal, and then with Niasia. Niasia told Douglas that she had concerns about going home because respondent left the night before, never fed them dinner, and they did not eat before they went to bed. Respondent came back home at midnight and was very upset and was cursing for over two hours. Niasia also told Douglas that respondent told her not to sleep tight because she

---

[5] We will continue to refer to the investigator as "Douglas" to minimize confusion.

was going to slit Niasia's throat and that respondent was smoking PCP again. Niasia was scared to go home.

¶ 23 Douglas took protective custody of the children on May 31, 2017, based on the threats from respondent, respondent's reported substance abuse from Niasia, and Raekwon's and Niasia's fear of returning home. Additionally, respondent had not complied with a drug screen test. Douglas testified that from May 31 until June 6, 2017, the children were placed at a shelter with a foster home environment, except Raekwon, who stayed with Leggins. She was on leave from work when the protective custody lapsed. She established a safety plan with respondent on June 6, 2017, at which time respondent told her that she had been diagnosed with depression but was in remission and did not need medication. On June 15, 2017, respondent came to the agency because of her concerns about Douglas handling the case. Respondent was unable to calm down and was escorted out of the agency. Respondent said that she would not sign consents for her mental health assessments but would bring in her own documentation.

¶ 24 On June 19, 2017, respondent came to the agency and requested a different investigator. Respondent also brought mental health documents that were deemed insufficient because they did not have a signature, letterhead or diagnosis. Douglas again reiterated to respondent that she needed a mental health assessment. On that date, Douglas' supervisor decided to take protective custody of the children because it was unclear that respondent's mental health was sufficient to care for the children, Raekwon and Niasia did not want to return home, and respondent was combative with the agency. Douglas testified that the children were not in respondent's care between May 31 and June 27, 2017.

¶ 25    The State admitted six exhibits at the hearing. Included in the exhibits were respondent's certified medical records from Mount Sinai Hospital in 2013 that indicated she had a history of positive PCP and marijuana use and that Tambi tested positive for PCP at birth. Also included were respondent's medical records from Lawndale Christian Health Center between 2012 and 2017, indicating that: respondent used marijuana and cocaine; respondent suffered from post-traumatic stress disorder (PTSD) but her bipolar disorder was in full remission (2012); respondent felt overwhelmed and expressed that she could not take care of another child; drug screening tests were positive for marijuana and PCP but negative for cocaine, opiates, barbiturates, amphetamines and benzodiazepines; respondent suffered from PTSD and bipolar with depression (2013); respondent tested positive for PCP and marijuana (2013); respondent reported marijuana use (2014); respondent suffered from bipolar disorder and depression (2015); and verified respondent's problems in 2016, including PTSD and bipolar disorder (provisional). Respondent's medical records from the Women's Treatment Center in 2013 indicated that she participated in a bio/psycho/social assessment at the direction of DCFS in which she admitted drug use but denied mental health issues. Respondent had a 2017 substance abuse screening/assessment which indicated that she met the criteria for residential treatment with the Gateway Foundation. A November 2017 court report from TASC indicated that respondent refused to submit to a urinalysis, even after she was told that it would be listed as a positive drop and that respondent self-reported a diagnosis of postpartum depression in 2013.

¶ 26    Respondent received a court-ordered psychological evaluation in July 2017, which noted that she was diagnosed with postpartum depression and PTSD and that respondent reported no

other mental health concerns. The psychological evaluation diagnosed respondent with PTSD and recommended therapy as well as monitoring by mental health professionals.

¶ 27    Other exhibits included a 2016 summary report regarding Raekwon's transition from Mercy Home, from which he voluntarily left on June 21, 2016. In the summary report, staff expressed concern about respondent's investment in Raekwon's treatment and her ability to provide a safe home environment; noted that respondent often appeared to be under the influence and was incoherent. The summary report noted that on the few times staff entered respondent's home to drop off Raekwon for a visit, there was dog urine on the floor, cigarette smoke in the air, multiple young children, sometimes respondent was not always there with the children, and respondent admitted to corporal punishment by hitting Raekwon in the face and sitting on him. Raekwon's intake report for Mercy Home in 2015 indicated: respondent self-reported that she was formerly addicted to PCP; she was previously arrested and incarcerated for selling PCP; she had a physical altercation with Raekwon during which she injured his lip. Raekwon was kicked out of the house by respondent; both Raekwon and respondent reported that respondent was frequently verbally abusive when she was under the influence of PCP; and respondent self-reported that she had approximately 40 contacts with DCFS by 2015.

¶ 28    After the State rested, respondent made a motion for a directed verdict for all of the children except Niasia and Raekwon which was denied by the court.

¶ 29    Respondent testified that she first met Beals in November 2016 when she was living in a shelter with her children except for Niasia, Charles and Chance. Beals gave respondent papers to fill out for low-income housing, but she only got one response from Wisconsin. Respondent testified that she was not required to do any services. She voluntarily asked for counseling

because some of the children were doing drugs. Respondent subsequently got money from DCFS to move into her own apartment. Regarding the May 30, 2017, incident with Niasia, respondent testified that Niasia was afraid because she knew she was "going to get a spanking because I spank my child." Respondent testified that Niasia told her she had been going to the library but was instead "screwing around with some little boy that she had become involved with." Respondent stated that she refused to do the urine drop because the judge had not ordered it, and she took the drug test the following day. Respondent also stated that the mental health documents she took to Douglas were from Lawndale Christian Health Center.

¶ 30    After closing arguments, the trial court found all seven children were neglected due to an injurious environment. There was no finding of abuse as alleged in the petition. The court found that respondent had struggled for a number of years to provide for her children, but had not been successful. The court also noted that as the children got older, they seemed to become more out of control. The trial court's written adjudication orders stated that Respondent had "4 prior indicated reports for substance misuse, inadequate supervision and substantial risk of physical injury/environment injurious to health/welfare by neglect. On or about November 15, 2016, an intact case was opened. This was the second time intact services have been offered to this family. Mother was noncompliant with services, including completing a substance abuse assessment and mental health assessment. Minors Raekwon and Niasia reported that mother was using illegal substances. Mother has been diagnosed with depression and bipolar disorder. Mother has threatened to harm minors [Niasia] and [Raekwon]."

¶ 31   The matter proceeded to a dispositional hearing on November 27, 2017, at which time the court found respondent unable to care for them, placed the children in the custody of DCFS, and made the children wards of the court.

¶ 32   This timely appeal followed.

¶ 33                                    DISCUSSION

¶ 34                                    A.  Timeliness

¶ 35   Before addressing respondent's claims, we find it appropriate to first discuss the timing of our decision. This is an accelerated appeal pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018).  Subsection (a)(5) of that rule provides that we are required to issue our decision within 150 days after the filing of the notice of appeal, except where good cause is shown.  Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). We cannot properly review a case and render our decision until we are fully briefed on the issues and the arguments of the parties. This makes the timely filing of the briefs imperative. This case was not ready for review and not received by this panel until May 17, 2019, and is being filed on June 21, 2019.

¶ 36   On December 26, 2017, a notice of appeal was filed in the trial court and the docketing statement was filed in this court on January 9, 2018. The original due date of the disposition was May 25, 2018. A motion for an extension of time to file the record was filed by respondent on January 31, 2018, with the record eventually being filed on March 12, 2018. Respondent next filed three requests for extension to file her brief, with a final extension until December 31, 2018. Nevertheless, respondent did not file her brief until March 25, 2019, after a motion to file her brief *instanter* was granted. Both the State Appellate Defender and the Office of the Public

Guardian filed extension requests for their appellee briefs, with the briefs subsequently being filed on May 2, 2019. Respondent's attorney did not file a reply brief.

¶ 37     Given the importance of the rights at stake, we choose not to penalize respondent for her counsel's disregard of Supreme Court Rule 311(a) (eff. July 1, 2018). Thus, good cause was shown to issue this decision beyond the deadline.

¶ 38                                     B.  Analysis

¶ 39                              1. Procedural Framework

¶ 40     Turning to the merits of the appeal, the Juvenile Court Act of 1987 (Act) sets forth the process by which a child may be removed from his or her parents and made a ward of the court. 705 ILCS 405/1-1 *et seq.* (West 2016). When a minor is taken into temporary protective custody, the State files a petition alleging that the minor is neglected, abused, or dependent, and that it is in the best interests of the minor to be adjudged a ward of the court. 705 ILCS 405/2-13 (West 2016). The court must conduct a temporary custody hearing within 48 hours, exclusive of weekends and holidays.  705 ILCS 405/2-9(1) (West 2016). At the temporary custody hearing, the court determines whether: (1) there is probable cause to believe the child is neglected, abused, or dependent. 705 ILCS 405/2-10(1), (2) (West 2016).

¶ 41     After the temporary custody hearing, an adjudicatory hearing is held to determine whether a preponderance of the evidence demonstrates that the minor is abused, neglected, or dependent. 705 ILCS 405/1-3(1), 2-21(1) (West 2016). Following a finding of abuse, neglect, or dependency, the trial court must then conduct a dispositional hearing to determine whether it is in the minor's best interest to be made a ward of the court, and if so, to hear evidence regarding

what disposition will best serve "the health, safety and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2016); *In re Arthur H.*, 212 Ill. 2d 441, 454 (2004).

¶ 42                    2. Hearsay Evidence at the Adjudicatory Hearing

¶ 43    On appeal, respondent contends that the adjudication orders should be reversed because the trial court relied on unreliable hearsay evidence of her mental health diagnoses, which were not supported. Respondent asserts that at the hearing, two caseworkers testified to what respondent self-reported to them regarding her mental health. Specifically, caseworker Beals testified that respondent told her that she already had a mental health assessment and that she "believed" respondent stated she was bipolar. Caseworker Douglas testified that respondent stated that she had been previously diagnosed with depression but was in remission and provided purported documentation of her remission.

¶ 44    The record does not indicate the respondent objected to this testimony at the hearing, nor was there a post-hearing motion filed raising this issue.

¶ 45    To preserve an issue for appellate review, a party must, even in child custody cases, object at trial and file a written posttrial motion addressing it. *In re William H.*, 407 Ill. App. 3d 858, 869 (2011). Here, respondent acknowledges that her counsel did not object to the testimony, nor was a post-hearing motion filed. Respondent is thus raising this issue for the first time on appeal, and review of this issue is forfeited. *In re S.J.*, 407 Ill. App. 3d 63, 66 (2011).

¶ 46    Respondent, however, contends that this issue may be reviewed under plain error because hearsay violations have been reviewed in child protection cases under plain error, citing *In re G.V.*, 2018 IL App (3d) 180272, as support.

¶ 47   We may review an unpreserved error under the plain error doctrine found in Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), which provides a limited and narrow exception to the general rule of procedural default. An appellate court may address a forfeited error affecting substantial rights under the plain error doctrine if the evidence is closely balanced or the error results in the denial of a substantial right and thus a fair hearing. *In re S.H.*, 2014 IL App (3d) 140500, ¶ 22; see also *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). While the plain error doctrine is most commonly applied to criminal proceedings, a parent's right to raise his or her biological child is a fundamental liberty interest, and rulings affecting that right may be reviewed for plain error. *In re J.J.*, 201 Ill. 2d 236, 243 (2002); *In re Andrea D.*, 342 Ill. App. 3d 233, 242 (2003). Thus we will examine the merits of respondent's contentions under plain error.

¶ 48   The first step in conducting plain error review, however, is to determine whether error occurred at all. *People v. Downs*, 2015 IL 117934, ¶ 15. Unlike at the dispositional hearing, at the adjudicatory hearing, the rules of evidence apply. 705 ILCS 405/2-18(1) (West 2016); *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 71. The admission of evidence by the trial court will not be reversed absent an abuse of discretion. *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 22. To be admissible, the evidence must be relevant. *In re A.W.*, 231 Ill. 2d 241, 256 (2008). Evidence is relevant if it "tends to prove a fact in controversy or renders a matter in issue more or less probable." *In re A.W.*, 231 Ill. 2d at 256.

¶ 49   Hearsay evidence is inadmissible in adjudicatory proceedings. 705 ILCS 405/2-18(1) (West 2016). Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible unless a specific exception applies. *In re J.B.*, 346 Ill. App. 3d 77, 81 (2004).  Illinois Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay

if the statement is offered against a party and is the party's own statement, in either an individual or a representative capacity. Ill. R. Evid. 801(d)(2)(A) (eff. Oct. 15, 2015). The party-admission doctrine is an exception to the hearsay rule. Statements of a party opponent constitute substantive evidence subject to consideration by the trier of fact. *Security Savings and Loan Ass'n v. Commissioner of Savings & Loan Ass'n.*, 77 Ill. App. 3d 606, 610 (1979).

¶ 50    Here, respondent is a party in the abuse and neglect petition. Both caseworker Beals and caseworker Douglas testified to statements made by respondent when she self-reported her mental health diagnoses to them in explaining why she had not participated in the DCFS-required mental health assessments. We find that the statements testified to by the caseworkers were properly admitted as statements by a party-opponent pursuant to Ill. R. Evid. 801(d)(2)(A) and were not inadmissible hearsay. Respondent's statements to the caseworkers concerning her mental health diagnoses were properly admitted as substantive evidence bearing on the issue of whether the minors were abused or neglected and the adjudication of wardship. Thus, respondent has failed to establish any reversible error in the trial court's admission of evidence, and we decline to apply the plain-error exception to the forfeiture rule with regard to respondent's contentions. See *People v. Brown*, 2017 IL App (1st) 142877, ¶ 54 (plain error requires that the error was reversible error).

¶ 51    In the alternate, respondent contends that her attorney was ineffective for failing to object to the alleged hearsay testimony at the adjudication hearing. This contention is without merit as we have concluded that the complained-of testimony was not inadmissible hearsay and not error. Thus, it was not unreasonable for counsel not to object to the testimony. *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 32.

¶ 52    We conclude that the trial court did not abuse its discretion in admitting or relying upon the caseworker testimony about respondent's self-reported mental health diagnoses as it was not inadmissible hearsay but admissible as a statement by a party-opponent as substantive evidence at the adjudication hearing. See *Security Savings and Loan*, 77 Ill. App. 3d at 610.

¶ 53    Even if the admission of the statements was error, the error would be harmless because the erroneous admission of hearsay evidence in an adjudication hearing constitutes harmless error where it is cumulative of other properly admitted evidence. *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 90. Moreover, error is considered harmless where ample evidence supported the court's findings. *In re J.C.*, 2012 IL App (4th) 110861, ¶ 29. The trial court's determination of neglect will not be disturbed on appeal unless contrary to the manifest weight of the evidence. *In re K.O.*, 336 Ill. App. 3d 98, 107 (2002).

¶ 54    In this case, the State alleged that the minors were neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2016)) and abused in that respondent created a substantial risk of physical injury to the minors other than by accidental means (705 ILCS 405/2-3(2)(ii) (West 2016)). The State's allegations were based on the following: respondent's four prior indicated reports for substance misuse, inadequate supervision and substantial risk of physical injury/environment injurious to health and or welfare; an intact case opened on November 15, 2016, which was the second time intact services were offered to the family; respondent was non-compliant with services including completing substance abuse and mental health assessments; two of the minors reported that respondent was using illegal substances; respondent was diagnosed with depression and bipolar disorder; and respondent threatened to harm two of the minors.

¶ 55　Beals and Douglas testified to respondent's many contacts with DCFS, incomplete service plans for respondent and the children, threats of physical violence as well as actual altercations between respondent and some of the children, and respondent's self-reported drug use and mental health issues. Respondent's medical records submitted by the State referenced respondent's various mental health diagnoses over several years and her drug use. We find that the testimony of respondent's self-reported mental health issues was cumulative to the information contained in her medical records. We therefore conclude that the trial court's conclusion that the minors were neglected due to an injurious environment was not against the manifest weight of the evidence based on the evidence presented at the adjudication hearing.

¶ 56　　　　　　　　　　　　CONCLUSION

¶ 57　For the foregoing reasons, we affirm the judgment of the circuit court of Cook County. Affirmed.