2022 IL App (1st) 220237-U

FIFTH DIVISION
August 5, 2022

No. 1-22-0237

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* W.L., a minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 16 JA 631 |
| | ) | |
| v. | ) | |
| | ) | |
| K.C., | ) | Honorable |
| | ) | Bernard Sarley, |
| Respondent-Appellant). | ) | Judge, presiding. |
| | ) | |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**ORDER**

¶ 1     ***Held*:** We affirm the circuit court's orders finding the respondent mother unfit and terminating her parental rights. The circuit court erred when it admitted out-of-court statements made by the deceased father of the minor indicating that the respondent committed acts of domestic violence against him. Nevertheless, because ample cumulative and corroborating evidence supported the judgment finding the respondent unfit and terminating her parental rights, the error was harmless. Affirmed.

¶ 2    Respondent, K.C., the mother of the minor, W.L., was found to be an unfit parent for failure to: (1) make reasonable efforts towards correcting the conditions that caused the removal of W.L. from her home; (2) make reasonable progress toward W.L.'s return home; and (3) maintain a reasonable degree of interest, concern, or responsibility for W.L.'s welfare. After a hearing to determine the best interests of W.L., the court terminated K.C.'s parental rights. K.C. does not challenge the manifest weight of the evidence supporting the court's findings that she was unfit and terminating her parental rights. Instead, she argues that the court erred by allowing a witness to testify regarding statements made by W.L.'s deceased father, Walter L., that K.C. committed domestic violence against Walter L., and that she was prejudiced by their admission. We affirm.

¶ 3                              BACKGROUND

¶ 4    On August 1, 2016, the State filed a petition to adjudicate wardship of W.L., who was born in 2009. The petition alleged that W.L. was abused and neglected following the death of an infant sibling who slept in the same bed as K.C. and the father of the sibling, Arkeen T.

¶ 5    The Illinois Department of Children and Family Services (DCFS) first opened a case against K.C. on July 19, 2015, after W.L.'s younger sister, A.T., another child fathered by Arkeen T., was taken to the hospital with bruises and abrasions on her head. She had fallen out of her stroller when Arkeen T. physically assaulted K.C. Arkeen T. admitted that he was intoxicated during the incident. W.L. witnessed the incident. K.C. became verbally aggressive with hospital staff when she learned that DCFS had been contacted and she had to be stopped by hospital security from leaving with W.L. and A.T. Arkeen T. admitted to choking K.C., and he and K.C. also admitted to previous domestic violence. W.L., who was six years old at the time, told a DCFS investigator that his mother and Arkeen T. fought frequently. K.C. also admitted to smoking

2

marijuana twice a day, three times a week. Arkeen T. told the DCFS investigator that K.C. "smokes marijuana every day, around the clock" and "used to smoke crack too."

¶ 6    DCFS instituted a service plan for K.C. to follow, but she moved to Danville, Illinois with her children because she had received subsidized housing. She returned to Chicago after giving birth to a son fathered by Arkeen T. On July 14, 2016, the infant, A.T., K.C., and Arkeen T. were all sleeping in a queen-size bed together. W.L. was not home at that time. K.C. woke up and found the infant unresponsive. He was later pronounced dead at the hospital. K.C. admitted that she had smoked marijuana the night before the infant's death. Arkeen T. stated that he had used a psychotropic medication that had not been prescribed for him the night before the infant's death.

¶ 7    After the State filed its adjudication petition, it also filed a motion for temporary custody of W.L. The circuit court placed W.L. in temporary custody of DCFS on August 1, 2016. On the same date, the court entered an order finding that Walter L. was W.L.'s father, based on K.C.'s and Walter L.'s admissions in open court.

¶ 8    On February 21, 2017, the circuit court entered an adjudication order finding that W.L. has been abused or neglected due to an injurious environment "because of the domestic violence between [K.C.] and [Arkeen T.] and their failure to participate in intact services." Among the evidence upon which the court relied in making its decision, the medical examiner's report for the deceased infant stated that "[t]here is a family history of domestic violence, alcohol use, drug use, and in-home tobacco use." In addition, a report from the A Knock At Midnight Family Advocate Center reflected that K.C. was not responsive to the center's multiple attempts for outreach and parenting training. Further, a psychological evaluation of K.C. concluded that she had a 10-year history of significant drug abuse, that she was living in an environment where drug and alcohol use is constant, and that her prognosis for abstinence was poor. The psychological evaluation also

reflected that K.C. "has significant intellectual and problem solving skills [deficits] that will make her ability to care for herself and her children independently unlikely" and "[t]hese difficulties suggest that she will have significant difficulty establishing and maintaining a home environment that is safe, consistent, and predictable." The court also entered a separate disposition order finding W.L. a ward of the court, appointing DCFS as his guardian, and finding K.C. and Walter L. were unable to care for him.

¶ 9     On December 13, 2017, the circuit court changed W.L.'s permanency goal from return home to guardianship, finding that K.C. had not made substantial progress in services. The court relied upon a July 10, 2017 service plan for K.C., in which she acknowledged "the domestic violence and substance and alcohol usage." She acknowledged that she was in need of services to regain custody of her children. On August 13, 2018, the court entered another permanency order reflecting a permanency goal of guardianship because "[r]eunification services were not completed by the parents." The court entered the next permanency order on February 25, 2019, which stated that W.L. had bonded to his foster parent. A July 17, 2019 permanency order reflected that K.C. visited W.L. "sporadically but is not engaged in any services. Father is not involved." In January 2020, W.L.'s foster parent had yet to obtain a license to become a foster parent, but expressed interest in adopting W.L. Walter L., W.L.'s father, died in September 2020.

¶ 10    On January 12, 2021, the State filed a petition to terminate K.C.'s parental rights. The petition alleged that K.C. was unfit based on: (1) a failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare; and (2) a failure to make reasonable efforts to correct the conditions that were the basis for removal of the child or reasonable progress towards the child's return home within a nine-month period following a finding of neglect. The petition further stated that it was in the minor's best interest that a guardian be appointed with the

right to consent to adoption, considering the minor had resided with a foster parent since July 28, 2016, the foster parent expressed a desire to adopt W.L., and the adoption was in the best interest of the minor. The State also filed a supplemental pleading alleging that K.C. had failed to make reasonable progress between every nine-month period from February 2017 to September 2021.

¶ 11    The circuit court conducted a parental fitness hearing beginning on December 9, 2021. Rolanda Bailey-Clark testified that she had been assigned as the family's caseworker from July 2016 to May 2018. Bailey-Clark completed a clinical integrated assessment to recommend K.C. for parental services, including individual counseling, drug and alcohol treatment, domestic violence services, parent coaching, parenting classes, and visitation. Bailey-Clark stated that K.C. did not attend domestic violence services or parenting classes. K.C. told Bailey-Clark that she did not need domestic violence treatment. Then, the following colloquy occurred:

> "[ASSISTANT STATE'S ATTORNEY (ASA)]: And during your contact -- or during your assignment to the case, in terms of your contact with [W.L.'s] father, did he ever report to you --
>
> [PUBLIC DEFENDER]: Objection. Hearsay.
>
> THE COURT: Okay. The father was a party at the time; right?
>
> [ASA]: Yes.
>
> THE COURT: What's the objection?
>
> [PUBLIC DEFENDER]: Hearsay.
>
> THE COURT: All right. Overruled. The father -- or the declarant at this time was a parent and there's an exception to hearsay that allows the statement in, so overruled.

[ASA]: During any of your conversations with the father while you were assigned to the case, did he ever report to you any concerns or incidents of domestic violence?

[BAILEY-CLARK]: Yes.

[ASA]: And approximately how many times did he report incidents of domestic violence between himself and the mother?

[BAILEY-CLARK]: Quite a few times.

[ASA]: And in terms of those reports to you, were those reports that were made to you in person, by phone, or both?

[BAILEY-CLARK]: Both.

[ASA]: And do you recall during any of those conversations specifically what the father reported to you about incidents of domestic violence between himself and the mother?

[BAILEY-CLARK]: Yes. He reported one time that mom stabbed him."

¶ 12     When Bailey-Clark was first assigned to the case, K.C. had weekly supervised visits with W.L. K.C. attended approximately 60% of the supervised visits. When K.C. attended the visits, Bailey-Clark occasionally observed K.C. would get upset with the rules instituted for the visit. Bailey-Clark stated that K.C. "would get upset, that she would explode and leave the room." Eventually, Bailey-Clark worked to calm the situation so that the visitation could continue. She never had to leave the visitation with the children. After Bailey-Clark reviewed K.C.'s psychological evaluation and clinical assessment, she recommended guardianship for W.L. Bailey-Clark continued to try to find free community services for K.C. for drug and alcohol treatment and domestic violence services, but K.C. did not engage in those services. During her

time as the family's caseworker, Bailey-Clark did not recommend that it was safe for W.L. to have unsupervised visits with K.C. W.L.'s foster parent was willing to supervise visitation with K.C. and Bailey-Clark encouraged K.C. to contact the foster parent to have more visitations with W.L. However, K.C. never contacted the foster parent to arrange additional supervised visits with W.L.

¶ 13    Kimiata Mottley, a former case manager assigned to the family's case from December 2018 to May 2019, also testified for the State. Mottley stated that K.C. was expected to engage in parenting classes, individual therapy, domestic violence treatment, and clinical, psychological, and psychiatric therapies. Mottley recalled having a phone conversation with K.C. during which K.C. specifically rejected domestic violence services because "she didn't need it." Mottley recommended only supervised visitation for K.C. and maintained the recommended goal of guardianship. While Mottley served as case manager, K.C. failed to complete any of the recommended services required for parental reunification.

¶ 14    Felicia Poindexter, a former case manager, testified that she was assigned to the case from December 2018 to September 2021. Poindexter testified similarly to Mottley. When she was assigned, W.L.'s permanency goal was guardianship, but she changed the permanency goal away from guardianship to parental termination. She did not recommend that W.L. return home to K.C. because K.C. had not completed individual therapy and it was unsafe for W.L. to return to his mother's custody.

¶ 15    K.C. testified that when she missed visits with W.L. on Mondays, it was because she had her other children staying with her during the weekend. She denied neglecting her children and stated that they spend the night with her. She stated that she took the children during holidays, bought them gifts, and took them on trips, unsupervised. K.C. testified that she had unsupervised visits with W.L. at her house twice a month since 2016. She also denied that Walter L. was W.L.'s

father. K.C. claimed that the only time Poindexter tried to find her was "when she tried to talk me into signing my parenting rights over to [the foster parent]." K.C. stated that she did not want to have her parental rights terminated "because I'm still parenting."

¶ 16    Luveina McGowan, W.L.'s paternal aunt, testified that she has served as the minor's foster parent from July 2016 to January 2017 and again since December 2017. W.L. never had an unsupervised visit with K.C. Walter L. was allowed to have unsupervised visits with W.L., but he never left him alone with K.C. Sometimes, K.C.'s mother attended the parental visits. W.L. stayed overnight at his maternal grandmother's home with K.C. present to celebrate Christmas and his birthday. Generally, McGowan had supervised K.C.'s visits with W.L. since 2016. K.C.'s last visit with W.L. occurred in October 2021. The visits were arranged by text message or phone call. McGowan was comfortable with supervised visits from K.C. with the maternal grandmother present. McGowan did not restrict W.L. from contacting K.C.

¶ 17    In addition to witness testimony, the circuit court considered reports submitted by the State. A December 2016 integrated assessment reflected that W.L. had witnessed Arkeen T. choking K.C., and separately, he observed Arkeen T. throw bleach onto K.C.'s face. The report stated that K.C. lacked knowledge of basic parenting skills and endorsed current use of alcohol and marijuana. The report also stated that K.C. lacked empathy for W.L. and "continued to focus on her needs and wants, ignoring the needs and wants of her children and her family."

¶ 18    A March 2017 psychological evaluation of K.C. reported that she had a mild intellectual disability and had significant intellectual and problem-solving skill deficits that made it unlikely she could care for her children independently. Although service plans for K.C. initially reflected her cooperation with participating in recommended services, the service plans from June 2018 through June 2021 showed that K.C. failed to complete any additional services. She had dropped

out of outpatient drug treatment in November 2017. She did not make herself available for drug tests and did not answer her phone. She also refused domestic violence treatment.

¶ 19    An August 2017 parenting capacity evaluation conducted by the Cook County Juvenile Court Clinic (CCJCC) reflected that she did not have empathy for W.L., which was demonstrated by her belief that he was not affected by witnessing the domestic violence incidents between her and Arkeen T. She did not employ any skills she may have learned in parenting classes and did not show positive modeling, praise, or affection for her children. Her tone with W.L. was at times harsh and punitive. K.C. also did not recognize that she was often the aggressor in domestic violence incidents and her family members reported that she was physically aggressive with them. Arkeen T. reported that K.C. had damaged his property and tried to stab him in the neck. As to domestic violence, the report stated:

> "A Cook County Order of Protection, dated August 2, 2016, stated that [Arkeen T.] filed one against [K.C.]. *** In regard to the narrative, it stated, '[K.C.] has been very strange towards me throughout our relationship. She has damage[d] my property, wrecked my vehicle. Also, the police have been called to the apartment on several different occasions. She threnghtned [*sic*] to stab me in my neck with a knife. She has pulled a knife on me before. She also comes to my mothers [*sic*] house and flip[s] out and use[s] verbal harassment to my mother and I. I don't feel comfortable because I can't trust her because I believe she will kill me."

¶ 20    When K.C. was asked during the evaluation if having an abusive boyfriend may have an effect on the children, she replied, "I dunno." When asked whether she thought W.L. witnessing her being choked by Arkeen T. affected him, she also responded, "I dunno." She also stated that

the children "shouldn't experience none of that stuff, the arguing," but when asked about the impact on the children, she again replied that she did not know.

¶ 21    The CCJCC report stated that K.C. "does not acknowledge that she is an aggressor in domestic violence situations." When discussing Arkeen T.'s order of protection, she fully dismissed any aggressive behavior, stating that he was lying. The report stated that the caseworker, Bailey-Clark, repeatedly noted that K.C.'s family said she was aggressive with them and that "her behavior became so problematic that the aunt did not want to continue to care for [W.L.]." The report recommended that "the domestic violence services be geared towards [K.C.] being an aggressor in the violence, as well as a victim, at times."

¶ 22    Following closing argument, the circuit court found the State proved by clear and convincing evidence that K.C. was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to W.L.'s welfare and for failure to make reasonable efforts to correct the conditions which were the basis for W.L.'s removal. Further, the court found K.C. made no progress regarding the completion of services. The court stated that K.C.'s visitation record was "very spotty," and that her testimony was not credible. The court then proceeded to the best interests portion of the termination hearing.

¶ 23    Danielle Brown, a foster care case manager, testified that she was assigned to the case on October 7, 2021. She found W.L.'s placement with the foster parent to be safe and appropriate. She described the bond between W.L. and McGowan as "a close bond," and that the other children in the home interacted like siblings. Brown stated that she has no concerns regarding the foster parent's ability to properly care for W.L. She observed that W.L. is attending school, that he did not need any special services, and had no medical issues. The foster home was a place of stability for W.L. and McGowan sought to adopt him. Brown recommended that it was in W.L.'s best

interests that K.C.'s parental rights be terminated. W.L. specifically told Brown that he wanted to stay with McGowan.

¶ 24    McGowan next testified that W.L. is attending the seventh grade and he has an individualized educational plan (IEP) for speech, reading, and math. She attends the annual IEP meetings, as well as parent-teacher conferences. She stated that she would be willing to adopt W.L. if parental rights were terminated. She explained that she desired to adopt him because "[h]e gets along well with everybody in the house and with the other extended family, and I think it's a good choice for him because he's safe and he's loved." W.L. told McGowan that he wanted to stay with her.

¶ 25    The circuit court found that it is in the best interests of W.L. to terminate the parental rights of K.C. The court entered a permanency goal of adoption. This appeal followed.

¶ 26                                ANALYSIS

¶ 27    On appeal, K.C. argues that the circuit court erred when it overruled her hearsay objection during the State's questioning of caseworker Bailey-Clark regarding whether Walter L. reported incidents of domestic violence involving her. Bailey-Clark testified that he had reported incidents of domestic violence "[q]uite a few times," and that K.C. had stabbed him one time. K.C. contends that these statements were inadmissible hearsay and improperly admitted, which prejudiced her in the parental termination proceedings. She does not challenge the manifest weight of the evidence supporting the unfitness and best interest findings. Instead, she seeks reversal of the unfitness findings based on the inadmissible and uncorroborated statements of Walter L.

¶ 28    Section 2-29 of the Juvenile Court Act provides a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). During the first step, the State must prove by clear and convincing evidence that the parent is "unfit" as that term is defined in

section (1)(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2020); *In re M.I.*, 2016 IL 120232, ¶ 20. When ruling on parental fitness, the circuit court does not consider the child's "best interests." *In re M.I.*, 2016 IL 120232, ¶ 20. When the court finds a parent unfit, it then considers the "best interests" of the child in determining whether parental rights should be terminated. *Id.* (citing *In re J.L.*, 236 Ill. 2d 329, 337 (2010)). The issue at this step of the proceedings is not whether the parent's rights may be terminated, but instead whether they should be terminated. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home." *Id.*

¶ 29     We review the circuit court's fitness and best interest findings to determine if they are against the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 495 (2002) (fitness); *In re F.P.*, 2014 IL App (1st) 140360, ¶ 93 (best interest). "A determination will be found to be against the manifest weight of the evidence only if the opposite conclusion is clearly evident [citation] or the determination is unreasonable, arbitrary, or not based on the evidence presented." *D.F.*, 201 Ill. 2d at 498. Under this standard, the court is afforded deference because "it is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *Id.* at 498-99. As a court of review, we may not "substitute [our] judgment for that of the [circuit] court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Id.* at 499.

¶ 30     Before we consider the merits of the appeal, we address the State's argument that K.C. forfeited any objection to testimony regarding domestic violence because she failed to file a posttrial motion contesting the admission of inadmissible hearsay. The State's argument was

rejected by our supreme court in *In re W.C.*, 167 Ill. 2d 307, 318-24 (1995), which held that the requirement for preservation of issues in posttrial motions for criminal cases does not apply to proceedings under the Juvenile Court Act, because they are not criminal. Accordingly, we reject the State's argument and turn to the merits of the appeal.

¶ 31    Hearsay is an out-of-court statement offered in a court proceeding to prove the truth of the matter asserted in the statement. *People v. Caffey*, 205 Ill. 2d 52, 88 (2001). Conversely, "testimony about an out-of-court statement which is used for a purpose other than to prove the truth of the matter asserted in the statement is not hearsay." *People v. Banks*, 237 Ill. 2d 154, 180 (2010). Hearsay statements are generally excluded because of the lack of opportunity to cross-examine the declarant. *People v. Peoples*, 377 Ill. App. 3d 978, 983 (2007). Here, if the State used the out-of-court statements of Walter L. to establish that K.C. committed acts of domestic violence, those statements were hearsay.

¶ 32    Evidentiary rulings are within the sound discretion of the circuit court and will not be reversed absent an abuse of discretion. *Caffey*, 205 Ill. 2d at 89. Illinois courts apply the abuse of discretion standard when reviewing a circuit court's decision regarding the admission of hearsay. *Id*. Here, the circuit court ruled that the statements at issue were admissible because Walter L. was a party to the proceedings when he made the statements. An abuse of discretion will be found only when the circuit court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the circuit court. *People v. Patrick*, 233 Ill. 2d 62, 68 (2009).

¶ 33    In response to K.C.'s argument that the circuit court improperly admitted Walter L.'s hearsay statements, the State and Public Guardian contend that Illinois Rule of Evidence 801(d)(2)(A) applies to this case and allows admission of the statement as an exception to the

general hearsay rule. Rule 801(d)(2)(A) provides that a statement is not hearsay if "[t]he statement is offered against a party and is [] the party's own statement, in either an individual or a representative capacity." Ill. R. Evid. 801(d)(2)(A) (eff. Oct. 15, 2015). "The party-admission doctrine is an exception to the hearsay rule." *In re Chance H.*, 2019 IL App (1st) 180053, ¶ 49. That evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. *People v. Aguilar*, 265 Ill. App. 3d 105, 113 (1994).

¶ 34    In this case, both the State and Public Guardian argue that Walter L. was a party to the proceedings at the time he made the statements, that his statements were the product of an adversarial proceeding, and that his statements were reliable because they comported with other evidence related to K.C.'s history of domestic violence. We disagree with the State and Public Guardian, and find that the circuit court improperly applied the party-admission doctrine.

¶ 35    Although Walter L. may have been a "party" to the proceedings as one of the parents of W.L. when he made the statements to caseworker Bailey-Clark, he was not the party "in play" for purposes of applying Rule 801(d)(2)(A). In order to apply Rule 801(d)(2)(A) appropriately, K.C. herself would have needed to provide statements regarding her own commission of domestic violence to the caseworker. If the caseworker had testified that *K.C.* told her she committed acts of domestic violence, then those statements would have fit under the rubric of Rule 801(d)(2)(A). In this case, K.C. was not the declarant. Neither the State nor the Public Guardian have provided us with any legal authority supporting their argument that Walter L.'s statements to caseworker Bailey-Clark fell under the exception provided by Rule 801(d)(2)(A). The rule makes clear that (1) the statement must be offered against a party, in this case, K.C., as she was the active party being contested for parental fitness, and (2) is the party's *own* statement, again, meaning K.C. and

not Walter L. The party admission must be generated from the party "in play," who in this case is K.C., and not from a different party. We find the circuit court abused its discretion when it allowed Walter L.'s hearsay statements through the testimony of Bailey-Clark.

¶ 36    The Public Guardian also contends that even if the circuit court erred when it allowed the statement under the party-admission doctrine, Illinois Rule of Evidence 804 applied, which made Walter L.'s statements admissible. Rule 804(a)(4) states that the "[u]navailability of a witness" includes situations in which the declarant "is unable to be present or to testify at the bearing because of death." Ill. R. Evid. 804(a)(4) (eff. Jan. 1, 2011). Rule 804(b)(3) provides an exception to the hearsay rule if the declarant is unavailable as a witness:

> "A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Ill. R. Evid. 804(b)(3) (eff. Jan. 1, 2011).

¶ 37    The Public Guardian argues that Walter L.'s statements fell within the exception under Rule 804(b)(3) because they "added to the other evidence that domestic violence was a serious issue between him and [K.C.], regardless of who instigated the violence." According to the Public Guardian, Walter L.'s interest would be to not disclose any domestic violence between himself and K.C., but instead he told the caseworker that he and K.C. had engaged in domestic violence.

¶ 38    The Public Guardian's view of the events underscores the reason why Rule 804(b)(3) is inapplicable. The declarant – Walter L. – was unavailable to testify because he was deceased. Ill. R. Evid. 804(a)(4) (eff. Jan. 1, 2011). His statements reflected that incidents of domestic violence occurred between himself and K.C. Those statements, however, do not specifically provide that

Walter L. committed acts of domestic violence against K.C. Instead, caseworker Bailey-Clark testified that when Walter L. specifically told her about one of the incidents, he stated that K.C. stabbed him. The record does not make clear, and the Public Guardian has not pointed out otherwise, that Walter L. himself committed acts of domestic violence against K.C. To simply surmise that he did is speculation in an attempt to shoehorn Rule 804(b)(3) to Walter L.'s statements. We reject the Public Guardian's attempt to apply Rule 804(b)(3) and we find it inapplicable here because it is unclear whether Walter L.'s statements "so far tended to subject [him] to *** criminal liability." Ill. R. Evid. 804(b)(3) (eff. Jan. 1, 2011).

¶ 39    Even if the admission of Walter L.'s statements through the testimony of Bailey-Clark was error, "the erroneous admission of hearsay evidence in an adjudication hearing constitutes harmless error where it is cumulative of other properly admitted evidence." *In re Chance H.*, 2019 IL App (1st) 180053, ¶ 53. "Moreover, error is considered harmless where ample evidence supported the court's findings." *Id.* We find the erroneous admission of hearsay evidence was harmless error in this case.

¶ 40    We consider first the circuit court's finding that K.C. failed to make reasonable progress towards reunification and therefore was unfit to parent W.L. was against the manifest weight of the evidence. Progress is measured by the parent's compliance with service plans and court directives "in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "Reasonable progress exists when the [circuit] court can conclude that it will be able to order the child returned to parental custody in the near future." *In re A.S.*, 2014 IL App (3d) 140060, ¶ 17; *In re Jacorey*, 2012 IL App

(1st) 113427, ¶ 21; *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006); *In Interest of L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 41    The record amply supports the circuit court's finding of unfitness. The court first adjudicated W.L. abused and neglected on February 21, 2017 because of domestic violence and K.C.'s failure to participate in services. In a July 10, 2017 service plan, K.C. acknowledged "the domestic violence and substance and alcohol usage." She also acknowledged that she was in need of services to regain custody of her children, but repeatedly failed to participate in those services despite the attempts of multiple caseworkers and agencies to recommend services and follow up with K.C. She also made very little if any effort towards correcting the conditions that caused the removal of W.L. Indeed, the permanency goal changed from return home to guardianship on December 13, 2017, because K.C. had not made substantial progress to participate in the recommended services. K.C. had a 10-year history of significant drug abuse and reports from various agencies and caseworkers all concluded that her prognosis for abstinence was poor.

¶ 42    The record is also replete with evidence that K.C. herself committed acts of domestic violence, even after disregarding the inadmissible statements of Walter L., and that even her own family considered her to be physically aggressive. She denied that she needed treatment for domestic violence and that the domestic violence affected W.L. An evaluation of K.C. stated that she lacked empathy for W.L. and "continued to focus on her needs and wants, ignoring the needs and wants of her children and her family." A psychological evaluation of K.C. found that she was not intellectually capable of caring for W.L. Furthermore, she was never allowed to have unsupervised visits with W.L. and never worked towards having supervised visits by attending the recommended services. K.C. made a minimal effort, at best, to make any progress toward a return

17

home. We conclude the circuit court's finding that K.C. was unfit to parent W.L. was not against the manifest weight of the evidence.

¶ 43    We next consider whether the circuit court's finding that it was in W.L.'s best interest to terminate K.C.'s parental rights was against the manifest weight of the evidence. The testimony at the best interest hearing revealed that W.L. was in a comfortable, stable, loving home and that McGowan, his foster parent, was willing to adopt him if parental rights were terminated. Brown, the foster care case manager, testified that she found W.L.'s placement with McGowan to be safe and appropriate. She described the bond between W.L. and McGowan as "a close bond," and that the other children in the home interacted like siblings. Brown stated that she has no concerns regarding the foster parent's ability to properly care for W.L. She observed that W.L. is attending school, that he did not need any special services, and had no medical issues. W.L. told both McGowan and Brown that he wanted to stay with McGowan.

¶ 44    The record amply supports the circuit court's finding that it was in W.L.'s best interest to terminate K.C.'s parental rights.  Accordingly, we find that the circuit court's ruling was not against the manifest weight of the evidence.

¶ 45                                 CONCLUSION

¶ 46    The circuit court erred when it admitted the hearsay statements of Walter L. through the testimony of the caseworker. However, we find this error was harmless in light of ample evidence of record supporting the court's finding that K.C. was unfit to parent W.L. We find the circuit court's finding of unfitness was not against the manifest weight of the evidence.  Likewise, the circuit court's finding that terminating K.C.'s parental rights was in W.L.'s best interest was not against the manifest weight of the evidence.  Accordingly, we affirm the decision of the circuit court.

¶ 47    Affirmed.